STATE v. NOLEGS *et al.*

JIM CROW OIL CO. v. NOLEGS *et al.*

NOLEGS v. EDMISTEN *et al.*

Nos. 4476, 4477, 4478.   Opinion Filed March 10, 1914.

1.   **NAVIGABLE WATERS—Ownership in State—Powers of Congress.**
The ownership of the navigable waters and the soil under them in
all the territory embraced in the Louisiana Purchase was held in
trust by the federal government, and as each of the states was
created, the same, within the boundaries of such state, passed
to it, and the absolute right to such navigable waters and the
soil thereunder is in the state, subject to the public rights and
the paramount power of Congress over navigation.

2.   **SAME—Title—Riparian Owner.** If a river is in fact navigable,
and in fact used for purposes of commerce, the title to the waters
thereof and the bed thereunder is held by the federal govern-
ment, and when a territory containing such navigable river be-
comes a state, the title thereto vests in the state, regardless of
subsequent navigation or navigability, and the fact that a ri-
parian ·owner obtains title to the land adjoining such stream
prior to statehood does not divest the state of such title.

3.   **EVIDENCE—Judicial Notice—Lands Under Water—Title.** The
Supreme Court takes judicial notice that the Arkansas river is
the largest western tributary of the Mississippi-Missouri system;
that it is two thousand miles long, draining an area of approxi-
mately 189,000 square miles; that it is navigable through its
course in the state of Oklahoma; that the title to the bed of the
Arkansas river to high-water mark, within the boundaries of
Oklahoma, is in the state.

4.   **NAVIGABLE WATERS—Title to Islands—Surveys.** An over-
sight in omitting an island in a navigable stream from the field
notes and plat of the government survey of 1872 did not divest
the United States of title thereto, nor interpose any obstacle to
a survey thereof being made in 1908.

5.   **SAME—Statutes—Validity—Effect.** The ownership of the bed of
the Arkansas river extends to high-water mark and the act of the
territorial Legislature of Oklahoma, St. Okla. 1890, sec. 4173
(Comp. Laws 1909, sec. 7254 [Rev. Laws 1910, sec. 6639]), was
in conflict with the Constitution of the United States when
enacted, and therefore void, and was never in force in Oklahoma
territory, and never became and is not. now the law of this
state.

6.   **NAVIGABLE WATERS—Title to Bed of Stream.** Where a gov-
ernment patent to land describes the same by lots and refers to

the official plat of the survey thereof and such plat shows that the land conveyed is bounded by a navigable river, the title extends no further than the edge of the stream and does not include an island, though the channel between that and the main land may not be navigable.

7. APPEAL AND ERROR—Parties—Jurisdiction—Title to Property. The United States not being a party to this action, this court cannot determine the question of title to the island between the federal government and Larry Nolegs.

(Syllabus by the Court.)

Error from District Court, Pawnee County; · L. M. Poe, Judge.

Action by the State of Oklahoma against Larry Nolegs, W. H. Edmisten, H. A. Thomas, J. E. Duffey, Producers' Oil Company, and the Milliken Oil Company, and the Jim Crow Oil Company intervenes. From a judgment for certain defendants and against the State, the Jim Crow Oil Company, and Larry Nolegs, the parties last named bring error. Dismissed as to Larry Nolegs, and reversed and remanded with directions.

Charles West, Atty. Gen., A. P. Crockett, Spec. Asst. Atty. Gen., and James H. Chambers, for the State.

Ledbetter, Stuart & Bell and Burwell, Crockett & Johnson, for the Jim Crow Oil Company.

Isaac D. Taylor and Preston A. Shinn, for defendant and plaintiff in error, Larry Nolegs.

F. B. Dillard, J. L. Autry, and A. L. Beaty, for defendants, H. A. Thomas, J. E. Duffy, and Producers' Oil Company.

LOOFBOURROW, J. The state of Oklahoma, plaintiff in error, was the plaintiff below, and commenced this action against the defendants in error, defendants below, to quiet title in and to the river bed of the Arkansas river in section 25, range 8, and in the west half of section 30, range 9, and an island described as lots 7 and 11 in said Arkansas river, the same being in the east half of said section 25 and the west half of said section 30, all in township 21. The state contends that the Arkansas river is a navigable stream, and that, under the common law

and the various acts of Congress, the United States held the title to the bed of such navigable stream and this particular island in trust for the state and until statehood, when such title passed to the state. The Jim Crow Oil Company intervened as the lessee of the Commissioners of the Land Office of the state of Oklahoma. The Arkansas river in Oklahoma is a meandered stream, the meander line appearing on the plats as forming one of the boundaries of each of the lots above and hereinafter mentioned. When the land in Pawnee county became subject to homestead entry defendant, H. A. Thomas, made homestead entry for the S. W. ¼ of the S. W. ¼, containing 40 acres, and lots one (1), containing 12.20 acres, two (2), containing 44.80 acres, and three (3), containing 22.10 acres, and holds by deed lot four (4), containing 41.30 acres, all in section 25, township 21, north of range 8 E., the north boundary of said lots being the meander line or right bank of the Arkansas river. Thomas leased said lots to defendant, J. E. Duffy, who assigned a three-fourths interest therein to the defendant, the Producers' Oil Company, for oil and gas purposes. It is further alleged that the Producers' Oil Company has drilled an oil well on its said lease, and has expended in so doing and otherwise developing said lands for gas and oil the sum of $10,000.

Defendant, W. H. Edmisten, holds, by warranty deed from one Caldwell, the title to lots eight (8), nine (9), and ten (10), of section 30, township 21 north, range 9 E., lots eight (8) and nine (9), lying on the right bank of the Arkansas river, and containing 21.40 acres and 24.16 acres respectively; Edmisten leased for oil and gas purposes said lots eight (8), nine (9), and ten (10) to defendant, Milliken Oil Company.

The defendants, H. A. Thomas and his grantees, and W. H. Edmisten and his grantees, contend that the Arkansas river is not a navigable stream, and that as the riparian owners they hold to the thread of the stream in the river bed, and further contend that the south channel of the Arkansas river, between the right bank thereof and said island, is no longer a part of the bed of the Arkansas river and that the title thereto, as well as the island, which is immediately north of lots three (3), four

(4), nine (9), and eight (8), respectively, is in the defendants as their interests respectively appear; and said Thomas and Edmisten and those claiming under them further contend that the tract of land referred to as an island is not, and never was, an island, and that said land is and always has been south of the main channel of the Arkansas river, and that the island and bed of the south channel of the Arkansas river is above low-water mark.

The defendant, Larry Nolegs, is a member of the Osage Tribe of Indians, and contends that the island in controversy, as well as what is now Osage county, was by treaty between the Cherokee Nation of Indians and the United States, awarded and set apart by the United States government for the Cherokee Nation of Indians, and that later the Cherokee Nation of Indians, in consideration of a sum of money to that tribe paid by the Osage Tribe of Indians, deeded to the United States, in trust for the Osage Indians, Osage county, together with all of the islands in the Arkansas river, excepting Turkey and Beaver islands; that through an oversight the island in controversy was not surveyed until 1908, at which time the United States government caused the same to be surveyed; that said island was designated in the field notes and plats as lot 7, in section 25, range 8, and lot 11, section 30, range 9, all in township 21 E., and that the same is located in Osage county; that said Nolegs is the owner thereof in fee simple, subject only to restrictions against alienation and the reservation to the United States for 25 years from June 28, 1906, of the oil and gas thereunder in trust for the Osage Nation or Tribe of Indians, and that said Nolegs was, on July 30, 1909, under and in pursuance of an act of Congress, entitled, "An act for the division of the lands and funds of the Osage Indians in Oklahoma Territory and for other purposes," approved June 28, 1906, together with other lands, duly allotted the said lots 7 and 11 by the approval then and there of the Secretary of the Interior of an allotment deed duly issued to said Nolegs, and executed by Peter C. Bigheart, principal chief of the Osages.

After the case was closed the trial court made certain findings of fact and conclusions of law, and entered judgment in

favor of the defendants Thomas and Edmisten, holding that they are the proprietary owners of the land in controversy, and that the plaintiff, the state of Oklahoma, and the defendant, Larry Nolegs, have no title or interest therein or thereto, and dissolving the injunction theretofore issued in said case.   From this judgment the state of Oklahoma, the Jim Crow Oil Company, and Larry Nolegs appeal.

Numerous errors are assigned by those aggrieved by the judgment below, and one of the principal questions is whether or not this court will take judicial notice that the Arkansas river is a navigable stream in such sense that the title of the bed thereof is vested in the state.   This identical question was before the Supreme Court of Kansas in *Dana v. Hurst et al., State, Intervener,* 86 Kan. 947, 122 Pac. 1041, in November, 1911, and again on rehearing in April, 1912.   There the title to an island in the Arkansas river in Reno county, near Hutchinson, was involved.   The court held that the Arkansas river is a navigable stream at that point in such sense as that the title to the bed of the river and the islands therein not claimed by the federal government passed to the state.

In the federal court for the eastern district of Oklahoma, in the case of the *United States v. Mackey et al.,* opinion by Judge Campbell, rendered in June, 1913, reported in 209 Fed. ——, wherein the question of the title to the bed of the Arkansas river, at a point near Tulsa, was involved, it is held that the Arkansas river is a navigable stream so far as concerned the question of title to the bed thereof, and that the state of Oklahoma owns the bed of the Arkansas river below high-water mark, and the case of *Dana v. Hurst, supra,* was expressly approved.

In addition to the numerous acts of Congress, public records and documents of the several departments at Washington, cited in the Kansas case, wherein the navigability of the Arkansas river is recognized, we find in the eleventh census report of the United States, 1890, in statistics of transportation by water, the following statement:

"Commencing at the head of navigation on the Arkansas and then following down through the fertile valley tributary to it, the cities of Wichita, Arkansas City, Fort Smith, Dardenelle, Little Rock, and Pine Bluff, six of the largest cities in the valley, which, together with their surrounding counties, have a population of over 400,000 inhabitants, depend very largely for their commercial growth and prosperity on the outlet furnished by this river, which in the census year carried 1,663,817 tons of freight."

Also, see letter dated March 26, 1908, from the Acting Commissioner of Indian Affairs, Honorable C. F. Larrabee, to the Secretary of the Interior, from which it appears that Lowerree Rucker Company had applied to the United States Indian Agency, Union Agency, for permission to enter into a contract for taking sand and gravel from the Arkansas river within the limits of the Cherokee Nation; at which time it also appears there were other contracts for the taking of sand and gravel from the Arkansas river, which the War Department had held to be a navigable stream, and that all the parties to such contracts were contending that from and after November 16, 1907, when the Indian Territory became a part of the state of Oklahoma, neither the Cherokee Nation nor the Department of the Interior had further jurisdiction with the matter; that they should no longer be required to pay royalty for sand and gravel taken from the bed of a navigable stream. J. G. Wright, Commissioner to the Five Civilized Tribes, asked for instructions; which letter concluded as follows:

"The Arkansas river throughout its length in the Cherokee Nation is a navigable stream under the laws of the United States.

"Under the above-quoted holding of the court, it must be conceded that when the state of Oklahoma was created, its jurisdiction and ownership of the lands below high-water mark of all navigable streams within its boundaries, became absolute. In other words, when the United States conveyed by warranty deed the lands occupied by the Cherokees, Creeks, Choctaws, Chickasaws, and Seminoles, it did not convey ownership of the beds of navigable streams, but reserved them for the benefit of the future state within whose boundaries they would fall. Thus, the state of Oklahoma, on its creation, became absolute owner of the bed of the Arkansas river, and the Cherokee Nation is not entitled to

royalty for any sand or gravel taken from the bed of that river since November 16, 1907.

                    "Very respectfully,
                        "(Signed)   C. F. LARRABEE,
"March 27, 1908.                        Acting Commissioner.
        "Approved:
            "(Signed)   JESSE E. WILSON, Secretary."

Also, see, chapter 238, 29 St. at L. 531, which is an act authorizing the Cleveland Bridge Company to construct a bridge across the Arkansas river between Pawnee county, Okla., and the Osage Indian reservation, on section 9, township 21, range 8 E., the same being three or four miles above the island in controversy in this case, which was approved February 17, 1897. The second section thereof is as follows:

"That the bridge constructed under this act shall be a lawful structure, and shall be recognized as a post route, upon which no charge shall be made for the transmission over the same of the mails, the troops, and the munitions of war of the United States, and equal privileges in the use of the said bridge shall be granted to all telegraph companies, and the United States shall have the right of way across said bridge and approaches for postal purposes; provided, that before the construction of any bridge herein authorized is commenced the said company shall submit to the Secretary of War, for his examination and approval, a design and drawing of such bridge and a map of the location, giving sufficient information to enable the Secretary of War to fully and satisfactorily understand the subject; and unless the plan and location of such bridge are approved by the Secretary of War the structure shall not be built; provided, further, that any bridge constructed under authority of this act shall at all times be so kept and managed as to offer reasonable and proper means for the passage of vessels and other water craft through or under said structure, and for the safety of vessels passing at night there shall be displayed on said bridge, from sunset to sunrise, such lights or other signals as may be prescribed by the Light-house Board."

Also, see 29 St. at L. 505, an act to authorize the Muskogee, Oklahoma & Western Railroad Company to construct and operate a line of railway through Oklahoma and the Indian Territory:

" *   *   *   And said railroad company is also hereby authorized, in case it so elects, for the greater accommodation of the public, to so construct its bridge across the Arkansas river as to make it a suitable and safe structure for the crossing of vehicles

of all kinds, animals and foot travelers, as well as railroad trains; provided, that the plans of structure of all bridges across navigable streams along and upon the right of way herein provided for shall be subject to the approval of the Secretary of War."

See, also, first section of an act of Congress to authorize the Ozark & Cherokee Central Railway Company to construct a bridge across the Arkansas river at Ft. Gibson, Indian Territory, approved February 24, 1902 (32 St. at L. 37), which is in terms practically the same as the second section of the act authorizing the Cleveland Bridge Company to bridge the Arkansas river, above quoted.

The above cases of *Dana v. Hurst,* supra, and *United States v. Mackey,* supra, both being exhaustive and well-considered opinions, the same are approved by this court and we hold that the Arkansas river is a navigable stream in its entire course through the state of Oklahoma, and that the title to the bed thereof, to the high-water mark, is in the state.

We will next determine what is meant by the term "high-water mark." In 4 Words & Phrases, 3289, it is said:

"In the case of fresh-water rivers and lakes in which there is no ebb and flow of the tide, but which are subject to irregular and occasional changes of height without fixed quantity or time, except that they are periodical, recurring with the wet or dry seasons of the year, high-water mark, as a line, between a riparian owner and the public, is to be determined by examining the beds and banks and ascertaining where the presence and action of the water are so common and usual and so long continued in all ordinary years as to mark on the soil of the bed a character distinct from that of the banks in respect to vegetation, as well as respects the nature of the soil itself. High-water mark is coordinate with the limit of the bed of the water; and that only is to be considered which the water occupies sufficiently long and continuously to wrest it from vegetation and destroy its value for agricultural purposes. *Carpenter v. Board of Com'rs of Hennepin Co.,* 58 N. W. 295, 297, 56 Minn. 513; *State v. District Court of Hennepin Co.,* 86 N. W. 455, 457, 83 Minn. 464; *Paine Lumber Co. v. United States,* 55 Fed. 854, 864; *Kiff v. Atchison, T. & S. F. Ry. Co.,* 4 Pac. 401, 403, 32 Kan. 263; *Bennett v. National Starch Mfg. Co.,* 72 N. W. 507, 508, 103 Iowa, 207; *Houghton v. Chicago, D. & M. R. Co.,* 47 Iowa, 370, 372; *St. Louis, I. M. & S. Ry. Co. v. Ramsey,* 12 S. W. 931, 933, 53 Ark.

314, 8 L. R. A. 559, 22 Am. St. Rep. 195; *Dow v. Electric Co.*, 45 Atl. 350, 351, 69 N. H. 498, 76 Am. St. Rep. 189."

In *Howard v. Ingersoll* (U. S.) 13 How. 381, 14 L. Ed. 189, Mr. Justice Curtis defined the banks and bed of a river and said:

"The banks of a river are those elevations of land which confine the waters when they rise out of the bed; and the bed is that soil so usually covered by water as to be distinguishable from the banks or both, produced by the common presence and action of flowing water. But neither the line of ordinary high-water mark or ordinary low-water mark, nor of a middle stage of water can be assumed as the line dividing the bed from the banks. This line is to be found by examining the bed and banks, and ascertaining where the presence and action of water are so common and usual, and so long continued in all ordinary years, as to mark upon the soil of the bed a character distinct from that of the banks, in respect to vegetation, as well as in respect to the nature of the soil itself. Whether this line between the bed and the banks will be found above or below or at a middle stage of the water, must depend upon the character of the stream.

"But in all cases, the bed of a river is a natural object, and is to be sought for, not merely by the application of any abstract rules, but as other natural objects are sought for and found, by the distinctive appearances they present, the banks being fast land on which vegetation appropriate to such land in the particular locality grows wherever the bank is not too steep to permit such growth, and the bed being soil of a different character and having no vegetation, or only such as exists where commonly submerged by water."

Also, see *U. S. v. Mackey, supra*, and cases therein cited.

The evidence in this case, consisting of the testimony of witnesses, as well as numerous photographs taken just prior to the trial, shows that the right bank of the south channel is from six to ten feet high; that in 1872 when the government caused the whole Indian country, as well as the land adjoining the banks of the Arkansas river at the places in question, to be surveyed, the water flowed around and on both sides of said island and through the north and south channels of said river; that in 1882 practically the same conditions existed, and that at the present time the north channel carries the greater amount of water, and that in the south channel water now stands in pools a part

of the year, but at times of high water the same flows through both the north and south channels; it also clearly appears that since the settlement of the country and cultivation of the lands on either side of the Arkansas river a less quantity of water reaches the stream than in former years, but it also appears from the photographs and other evidence in this case that in the bed of the south channel, between the well-defined banks thereof, the same is and has been submerged so long and so frequently in ordinary seasons that vegetation will not and does not grow thereon, and it is therefore to be regarded as a part of the bed of the river which overflows it, notwithstanding the fact that the main channel of the Arkansas river at said point may now be the north channel thereof.

The Supreme Court of California, in *Packer v. Bird*, 71 Cal. 134, 11 Pac. 873, held that where, by the terms of a patent, land is bounded by a navigable river the title extends no further than the edge of the stream and does not include an island, though the channel between that and the main land may not be navigable.

Great stress is placed upon the fact that the island was not surveyed until after the patents were issued by the United States government for the lots 1, 2, 3 and 4, now the property of Thomas, and lots 8 and 9, now the property of Edmisten. So far as the record discloses these lots each contain as many acres of land now as they did at the time they were surveyed, or at the time that they were paid for by the homestead entrymen, and it cannot be said that the failure of the surveyors to survey the island in 1872 was calculated to induce the purchasers of the fractional subdivisions to believe that by paying for the number of acres in each of these lots they would get title to this island, consisting of nearly 85 acres, as well as the several acres of land in the bed of the south channel of the Arkansas river. That the island was in existence at the time the survey of 1872 was made is found by the trial court and is amply supported by the evidence of witnesses, as well as the physical facts. At the time of the trial the island had growing thereon red oak, post oak, elm, walnut, mulberry, huckleberry, sycamore, cottonwood, willow and

ash trees, some of which were as much as 36 inches in diameter, the larger trees being on the north part of the island; in 1882 this island was timbered, some of the trees then being two feet in diameter, the south channel then carrying the greater volume of water; the banks of the island are, in many places, abrupt and steep and as high in places as the opposite banks of the river.

It is earnestly contended by defendants H. A. Thomas and those holding under him that the act of the territorial Legislature of Oklahoma, St. Okla. 1890, sec. 4173 (Comp. Laws 1909, sec. 7254 [Rev. Laws 1910, sec. 6639]), which attempted to vest the title of riparian owners on navigable waters in this state at low-water mark, should control in this case. This identical question arose in *U. S. v. Mackey, supra,* and it is therein held that the Legislature of the territory of Oklahoma had no power to enact such a law and it is therefore void and was not carried over and did not become a law in the state of Oklahoma. The reasoning of the court is sound and numerous authorities cited therein on this proposition amply support the same, and we are fully convinced that the Legislature of the territory of Oklahoma had no power to confer title in riparian owners of the land below high-water mark in navigable waters which were held in trust by the United States for the then future, and now state of Oklahoma; that said territorial act was in conflict with the Constitution of the United States and never in force as a law in Oklahoma Territory, and when statehood intervened said statute did not come within the adopting provisions of the state Constitution, and never became a law of this state.

The title of the riparian owners, Thomas and Edmisten, stops at the high-water mark on the right bank of the south channel of the Arkansas river, while the title of the state begins at the high-water mark on both the right and left bank of the Arkansas river, including the entire bed thereof, and extending to the high-water mark surrounding said island. See *U. S. v. Mackey, supra;* also, *Scott v. Lattig,* 33 Sup. Ct. Rep. 242, decided February, 1913, cited in the opinion of Judge Campbell. In that case the title to an island in the Snake river between

Idaho and Oregon was involved; *held,* that omitting an island in a navigable stream from the field notes of a plat of the government survey did not divest the United States of title or interpose any obstruction to a subsequent survey thereof; that upon the admission of Idaho to statehood, the ownership of the bed of the Snake river on the Idaho side of the thread of that stream, which forms the state boundary line, passed from the United States to the state, subject to the public rights and the paramount powers of Congress over navigation; that the disposal by the United States of the fractional subdivisions on the east bank of the Snake river where it forms the boundary line between Idaho and Oregon, carried with it no right to the bed of the river save as the law of the state of Idaho may have attached such a right to private riparian ownership; that a large island on the Idaho side of the Snake river, a navigable stream, being in existence when Idaho became a state did not pass to the state upon the admission of statehood or come within the disposing influence of its laws, but remained the property of the United States, subject to disposal of it.

As to the contention of Larry Nolegs, indicated in the statement of this case, having found that defendants, H. A. Thomas and W. H. Edmisten, have no interest therein, and that the title of the state extends only to the high-water mark of said island, it is not essential that this court pass upon the question of the title of said Nolegs, that being a matter with which the United States and Larry Nolegs only are concerned, and, the United States not being a party to this action, the case should be dismissed without prejudice as to Larry Nolegs, unless the United States becomes a party thereto. The judgment as to the other parties in this action is reversed and remanded, with directions to proceed in accordance with this opinion.

All the Justices concur.