**BREWER-ELLIOTT OIL & GAS CO. et al. v. UNITED STATES et al.**

(Circuit Court of Appeals, Eighth Circuit. December 14, 1920.)

No. 5434.

1. **Navigable waters ☞1(3)—Test of "navigability" stated.**
The test of navigability in fact of a stream is whether in its natural condition it is used or capable of use for the ordinary purposes of trade and travel by water and for carrying to market the products of the country through which it runs.
[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Navigable.]

2. **Courts ☞367—Where rights are acquired previous to state decision, such decision not binding on federal courts.**
Where rights have been acquired under contracts, grants, or conveyances which under the then state of the law were valid and enforceable, and the claim is asserted that by subsequent decisions of state tribunals a different rule of property and state of the law have been created which invalidate such contracts or grants and destroy the rights vested under them, the federal courts are not bound by such later rule of property or state of local law, but may and should exercise their judgment as independent tribunals.

3. **Indians ☞12—Treaty patent to lands including river conveys title to river bed.**
Under the patent from the United States to the Cherokee Nation of December 1, 1838, made pursuant to prior treaties and conveying land expressly including within its boundaries both banks of the Arkansas river, and Act June 5, 1872, and the deed from the Cherokee Nation made pursuant thereto June 14, 1883, conveying a part of such land to the Osage Tribe, that tribe *held* to have acquired title to that part of the tract under the Arkansas river lying to the north and east of the center of the channel, leaving no right in the United States which passed to the state of Oklahoma on its admission.

4. **Navigable waters ☞36(1)—United States has power to convey lands under navigable waters in territories.**
The United States has always been both sovereign and proprietor in its territories, and has always had the right and power to dispose absolutely of any of its public land therein and, while it has held its public lands in its territories below high-water mark under navigable waters in trust for future states, and has not conveyed them by general laws, and has acted upon the policy of leaving the administration and disposition of the sovereign rights in navigable waters and in the soil under them to the control of future states when admitted, nevertheless it has always

possessed and has frequently exercised the absolute power to grant such lands and any interest it had in them irrevocably whenever it became necessary to do so to perform international obligations or to carry out other public purposes appropriate to the objects for which it has held the lands in its territories.

5. **Waters and water courses** ☞89—**Lands in territories under nonnavigable waters not held in trust for future states.**

The United States has never held its public lands in the territories under nonnavigable waters under any trust for future states, but has always had and exercised the absolute right to grant and dispose of such lands absolutely as appurtenant to and parts of the property granted or conveyed by it to the riparian owners of the adjacent banks according to the existing law upon the subject of the rights of riparian owners at the times of the respective grants.

Appeal from the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Suit in equity by the United States and others against the Brewer-Elliott Oil & Gas Company and others. Decree for complainants, and defendants appeal. Affirmed.

For opinion below, see 249 Fed. 609.

About 1913 oil and gas were discovered in the bed of the Arkansas river north of the thread of the main channel thereof, which was the south boundary of the lands of the Osage Tribe of Indians. Thereupon the state of Oklahoma leased to certain oil corporations parts of the bed of the Arkansas river above the mouth of the Grand river between the high-water mark on the north side of the river and the thread of the main channel, and authorized them to take the oil and gas therefrom in consideration of certain royalties specified in these leases. The defendants in this case are parties claiming under these leases. In 1914 the United States, as trustee for the Osage Tribe, under the Allotment Act of June 28, 1906, 34 Stat. §§ 2, 3, 4, pp. 542, 543, and 544, claimed that these parts of the bed of the river and the oil and gas therein were the property of that tribe under grants thereof made in 1838 and 1872, and brought this suit against those claiming under these leases, for an injunction against the extraction of the oil and gas by them, and for other relief. The defendants answered that the river was navigable, that the title to the leased premises between high-water mark and the thread of the main channel of the river vested in the state of Oklahoma, wherein these lands are situated, on its admission to the Union, and that its leases were valid. The United States insisted that the river was not and never had been navigable. The state of Oklahoma and the Commissioners of its Land Office intervened and asserted the navigability of the river at the places leased and the title of the state to the premises in controversy. The parties stipulated that a receiver be appointed to collect and hold the royalties under the leases for the benefit of the party who should ultimately be adjudged entitled thereto. Such a receiver was appointed, and the lessees proceeded thereafter to extract the oil and gas and pay the royalties to the receiver. The issues were tried, the court below adjudged that the river was not and never had been navigable; that the Osage Tribe was the owner of the land in the bed of the river in controversy and the oil and gas therein under the patent of the United States to the Cherokee Nation of December 1, 1838, and the treaties between them in performance of which that patent was made and delivered, under the Act of June 5, 1872, 17 Stat. 228, 229, and the deed of the Cherokee Nation to the Osage Tribe of June 14, 1883; under the Treaty of July 19, 1866, 14 Stat. 799; under the Treaty between the United States and the Osage Tribe of September 29, 1865, 14 Stat. 687, 690, art. 16; and under the Act of July 15, 1870, 16 Stat. 362, in pursuance of which that deed to the Osage Tribe was made. Thereupon the court rendered a decree in favor of the United States for the benefit of the Osage Tribe for the relief

sought by the United States in its complaint. The defendants and the interveners appealed from this decree.

W. A. Ledbetter and John H. Miley, both of Oklahoma City, Okl. (S. P. Freeling, Atty. Gen., and H. L. Stuart, R. R. Bell, and E. P. Ledbetter, all of Oklahoma City, Okl., on the brief), for appellants other than Arkansas River Bed Oil & Gas Co.

Paul Pinson, Sp. Asst. Atty. Gen. (Herbert M. Peck, U. S. Atty., of Oklahoma City, Okl., on the brief), for appellee United States.

James B. Diggs, of Tulsa, Okl. (Rush Greenslade and William C. Liedtke, both of Tulsa, Okl., R. L. Batts, of Pittsburg, Pa., and D. Edward ,Greer and John E. Green, both of Houston, Tex., on the brief), for appellee Gypsy Oil Co.

John J. Shea and Thomas F. Shea, both of Tulsa, Okl., and T. Austin Gavin, amici curiæ.

Before SANBORN and CARLAND, Circuit Judges, and MUNGER, District Judge.

SANBORN, Circuit Judge (after stating the facts as above). The appellants assigned 12 alleged errors in the hearing and disposition of this case, but when reduced to their lowest terms they present only two questions that, in the view the court takes of the facts and the law, it is necessary to consider and decide. Those questions are: (1) Did the court below make a mistake of fact in its finding that the Arkansas river was not navigable at the place of the premises in controversy? (2) If it was not mistaken in its finding of fact upon that subject, did .it fall into an error of law because, although that river was not and never had been in fact navigable, it did not hold and adjudge as a matter of law that it was navigable, and that the title to its bed below high-water mark and to the oil and gas therein was in the state of Oklahoma, and not in the Osage Tribe, in view of the decision of the Supreme Court of Oklahoma in State v. Nolegs, 40 Okl. 479, 486, 139 Pac. 943, rendered in March, 1914, to that effect.

[1] In determining whether or not the river was navigable in fact, the court below stated the rule by which it measured the evidence upon that subject in these words:

"It will be deemèd navigable, when used or susceptible of use, in its ordinary condition, as a highway of trade and travel in the customary modes on water. * * * To meet the test * * * a water course should be susceptible of use for the purposes of commerce or possess a capacity for valuable floatage in the transportation to market of the products of the country through which it runs."

And it cited in support of that rule The Daniel Ball, 10 Wall. 557, 19 L. Ed. 999, The Montello, 20 Wall. 441, 22 L. Ed. 391, United States v. Cress, 243 U. S. 316, 37 Sup. Ct. 380, 61 L. Ed. 746, United States v. Rio Grande Irrigation Co., 174 U. S. 690, 19 Sup. Ct. 770, 43 L. Ed. 1136, and Harrison v. Fite, 148 Fed. 781, 78 C. C. A. 447. Counsel for the appellants argue that this rule was erroneous in that it failed to declare that a stream is navigable if it can be so improved as to make it useful as a highway of travel and transportation. But it is obvious

that the modification of the test adopted by the court by the insertion or addition of such a declaration would immediately raise the question whether or not a stream is navigable which was not, but might be made useful for transportation purposes at an expense far above the value of its possible use, and, if not, what the determining limit of such expense should be and thus the test would be rendered indefinite and impracticable. No persuasive reason or authority has been presented or discovered for such a modification of the rule applied by the chancellor below. That rule is sustained by the decisions of the Supreme Court and of this court, and there was no error in its statement or application in the hearing and decision of this case.

Upon the issue of the navigability of the Arkansas river above the mouth of the Grand river and at the place of the leased lands a vast mass of evidence was introduced, consisting, among other items, of the government surveys and meander lines of the river, congressional appropriations for its improvement, congressional grants of the privilege of constructing bridges over it, opinions and decisions of the officials of the Interior Department and of the officials of the War Department at various times with reference to the river's navigability, reports of the engineers of the War Department at various times relevant to this question, testimony of engineers who had been in charge of work on the river and of engineers who had been familiar with it, and the testimony of many other witnesses, many of whom had resided near it for many years, and all of whom were more or less acquainted with the river and its condition at various times in the past at and near the place under consideration and at other places above the mouth of the Grand river. For a more extended portrayal of this evidence reference is made to the opinion below, where the District Judge with enviable patience and clarity has set down the extent and character of this evidence and expressed his opinion of its effect. United States v. Brewer-Elliott Oil & Gas Co. (D. C.) 249 Fed. 609, 617, 624. No purpose would be served by reciting in detail here or by discussing this evidence. Suffice it to say that all the evidence on this issue and all the objections thereto have been exhaustively examined in the light of the arguments and briefs of counsel, and the conclusion is that the competent and relevant evidence on this subject leaves no doubt that the fact is, as the court found it to be, that the Arkansas river above the mouth of Grand river and at the place of the leased premises is not now and never has been a navigable stream.

[2] But counsel for the appellants earnestly maintain that, although the fact is that the river is and always was unnavigable at the locus in quo, the question of its navigability is a question of the local law of the state of Oklahoma, that by the local law of that state, evidenced by the decision of its Supreme Court on March 10, 1914, in State v. Nolegs, 40 Okl. 479, 139 Pac. 943, the Arkansas river at the place of the leased lands in controversy is a navigable stream, and that the court below ought so to have held under the established rule that the decisions of the highest judicial tribunal of the state regarding its Constitution and statutes and local law which established settled rules of property in that state are controlling authority in the courts of the Unit-

ed States where no question of rights under the Constitution or laws of the nation and no question of general or commercial law is involved. Lloyd et al. v. Fulton, 91 U. S. 479, 482, 23 L. Ed. 363; Jaffray v. McGehee, 107 U. S. 361, 364, 365, 2 Sup. Ct. 367, 27 L. Ed. 495; Detroit v. Osborne, 135 U. S. 492, 10 Sup. Ct. 1012, 34 L. Ed. 260; Paine v. Willson, 146 Fed. 488, 489, 77 C. C. A. 44, 45; First Nat. Bank of Humboldt, Neb., v. Glass et al., 79 Fed. 706, 708, 25 C. C. A. 151, 153.

But there is an exception to this rule as just, as salutary, and as firmly established as the rule itself. It is that, when transactions have been had, contracts, grants, or conveyances have been made, and rights have thereby accrued and vested in a state of the laws and under the rules of property under which such rights are valid and enforceable, and the claim is asserted that by decisions of state tribunals subsequent to the accrual of such rights a different rule of property and state of the law has been created, which, if applied to the determination of the effect of such prior transactions, contracts, grants, or conveyances, would invalidate them and destroy the vested rights under them, the federal courts are not bound by such later rule of property or state of local law, the power is conferred and the duty is imposed upon them to hear and determine the claims of the parties in interest as in right and reason they ought to determine them according to the dictates of their own opinions as independent tribunals. Burgess v. Seligman, 107 U. S. 20, 33, 34, 35, 2 Sup. Ct. 10, 27 L. Ed. 359; Great Southern Hotel v. Jones, 193 U. S. 532, 542, 548, 24 Sup. Ct. 576, 48 L. Ed. 778; Kuhn v. Fairmont Coal Co., 215 U. S. 349, 356, 30 Sup. Ct. 140, 54 L. Ed. 228; Kobey v. Hoffman et al., 229 Fed. 486, 488, 143 C. C. A. 554, 556; Pleasant Township v. Ætna Life Ins. Co., 138 U. S. 67, 73, 11 Sup. Ct. 215, 34 L. Ed. 864; Westinghouse Air Brake Co. v. Kansas City Southern Ry. Co., 137 Fed. 26, 35, 71 C. C. A. 1, 10; Speer v. Board of County Commissioners, 88 Fed. 749, 760, 32 C. C. A. 101, 112; U. S. Savings & Loan Co. v. Harris (C. C.) 113 Fed. 26, 27, 28, 38, 39; Clapp v. Otoe County, 104 Fed. 473, 476, 45 C. C. A. 579, 582. The case of Kuhn v. Fairmont Coal Co., 215 U. S. 349, 355, 356, 30 Sup. Ct. 140, 54 L. Ed. 228, presented this question under a state of facts analogous so far as this question is concerned, to those in this case, and the Supreme Court said:

"When contracts and transactions are entered into and rights have accrued under a particular state of the local decisions, or when there has been no decision by the state court on the particular question involved, then the federal courts properly claim the right to give effect to their own judgment as to what is the law of the state applicable to the case, even where a different view has been expressed by the state court after the rights of parties accrued." Page 360 of 215 U. S., page 143 of 30 Sup. Ct. (54 L. Ed. 228).

[3] Now the right and title of the Osage Tribe to the bed of the river north and east of the thread of its main channel and to the oil and gas therein at the place of the leased premises accrued and vested in its predecessor in interest, the Cherokee Nation, on December 1, 1838, under the patent of the United States of that date and the trea-

ties between the United States and the Cherokee Nation of May 6, 1828 (7 Stat. 311), of February 14, 1833 (7 Stat. 414, 415, 416), and of December 29, 1835 (7 Stat. 478), in execution of which that patent was made and delivered. By its express terms the grant of that patent conveyed a tract of land which included within its boundaries both banks of the Arkansas river and the land under it at the place of the leased premises. This right and title of the Cherokee Nation to the portion of the bed of the river here in controversy which lies north and east of the main channel of the river was conveyed and confirmed to the Osage Tribe by the act of Congress of June 5, 1872 (17 Stat. 228, 229), and by the deed of the Cherokee Nation to that tribe of June 14, 1883, which was made in performance of the treaty between the United States and the Cherokee Nation of July 19, 1866 (articles 15 and 16, 14 Stat. 799), of the treaty between the United States and the Osage Tribe of September, 29, 1865; and of the act of Congress of July 15, 1870 (16 Stat. 362). So it was that the title and rights of the Osage Tribe to the property in controversy accrued and vested in its predecessor in interest more than 70 years before the local rule of property counsel for the state invoke to the effect that the Arkansas river is navigable in law although it is not and has never been navigable in fact was declared in the region where the property in controversy is situated. There was no such rule of law in the region where the leased premises are situated when the right and title claimed by the Osage Tribe accrued and vested in the Cherokee Nation in 1838, or when it was confirmed to and vested in the Osage Tribe in 1872 and 1883. At those times and long after the established and prevailing rules of law were that the navigability of this river was a question of fact determinable by the evidence under the definition of navigability already discussed, and the decision and opinion of the Supreme Court of Oklahoma in the Nolegs Case has not relieved the national courts of the duty to consider and determine the claims to the premises in controversy arising under the patent, the treaties, and the deeds under which the Osage Tribe claims according to their opinions as independent tribunals. The court below so considered and decided them, and the only question remaining is whether or not it fell into an error of law in its conclusion that, in view of the fact that the river was not and never had been navigable in fact, it could not rightly be held to be navigable in law to the destruction or impairment of the rights which accrued and vested in the Osage Tribe under the treaties and conveyances to which reference has been made.

The theory of counsel for the state is that, if this river is navigable, the United States held the title to the bed of the river below high-water mark until the admission of Oklahoma into the Union in 1907, when that title vested in the state, but that, if it was not navigable, the title to the bed in controversy vested in the Osage Tribe. This theory ignores the grave question whether or not the United States did not by the treaties and grants to which reference has been made vest in the Cherokee Nation in 1838, and thereafter in the Osage Tribe, its successor in interest, the title to this property even if the river was navigable. Shively v. Bowlby, 152 U. S. 1, 48, 58, 14 Sup. Ct. 548, 38 L.

Ed. 331; Alaska Pacific Fisheries v. United States, 248 U. S. 78, 87, 90, 39 Sup. Ct. 40, 63 L. Ed. 138; United States v. Romaine et al., 255 Fed. 253, 260, 166 C. C. A. 423, 430; Knight v. U. S. Land Association, 142 U. S. 161, 183, 184, 12 Sup. Ct. 258, 35 L. Ed. 974. As, in the view we take of the evidence and the law in this case, it is not necessary to a disposition of it to discuss and decide this question, we lay it aside without intimating any opinion upon it. Conceding, but not deciding or admitting, that counsels' theory is sound, we consider the question now in hand whether, in the construction and application of the treaties, acts of Congress, and conveyances under which the Osage Tribe holds, the court below erred in deciding that, so far as the navigability of the river conditions that tribe's title, it was not and is not navigable in law while it is not and never was navigable in fact.

In the consideration of this question the facts must be borne in mind that the rights here judicable took their rise and rest, not only in contracts, but in treaties between nations; that they accrued and vested more than half a century ago; that these treaties, acts of Congress, and conveyances must be considered and interpreted in the light of the times and circumstances in which they were made; that the intention of the parties when they were made, if ascertainable from them and the circumstances surrounding them, should be carried into effect unless clearly violative of some established law or public policy, that these treaties, conveyances, and the negotiations and transactions whose results they embody were between a powerful nation of learned and intelligent people, on the one hand, and in their language, and Indian nations or tribes, on the other, unfamiliar with the language and the laws of the United States and largely dependent upon that nation; that these treaties, conveyances, and transactions between the United States and these Indian nations must under these circumstances be construed, applied, and enforced, "not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians" (Jones v. Meehan, 175 U. S. 1, 11, 20 Sup. Ct. 1, 5, 44 L. Ed. 49), "as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection," and "inequality is to be made good by the superior justice, which looks only to the substance of the right without regard to technical rules" (Choctaw Nation v. United States, 119 U. S. 1, 28, 7 Sup. Ct. 75, 30 L. Ed. 306; Seufert Bros: Co. v. United States, 249 U. S. 194, 198, 39 Sup. Ct. 203, 63 L. Ed. 555).

The intention of the parties when the treaties and conveyances under consideration were made is the important element in the determination of the rights of the Osage Tribe under them. In view of the facts that the United States conveyed, pursuant to the agreements in the treaties, to the Cherokee Nation in December, 1838, a tract of land which included the lands on both banks of the Arkansas river and the land under it at the location of the leased premises, that by the act of 1872 the deed of 1883 from the Cherokee Nation to the Osage Tribe, and the treaties and acts of Congress on which they were founded, the United States and the Cherokee Nation confirmed and conveyed to that tribe the land and the premises in controversy bounded on the south by

the act of 1872 by "the main channel of the Arkansas river," that at the time of these conveyances and treaties that river was not and has never since been in fact navigable, that there was no established rule of law at those times in that country to the effect that that river or any other such river, though unnavigable in fact, was navigable in law, it is incredible that it could have been the intention of the United States and these Indian tribes to except from these grants that which by their plain terms they included, the portions of the bed of the Arkansas river below high-water mark. The terms of the treaties and the conveyances, the times and circumstances under which they were made, the objects the parties to them sought to attain thereby, the facts that the Indian tribes took and occupied the lands thus conveyed, all converge with compelling force to persuade that the United States and these Indian tribes intended, by these grants and conveyances and the treaties on which they were founded, to convey to and vest in the Osage Tribe of Indians the right and title to the leased premises here in dispute; that by those treaties, acts of Congress, and conveyances they did so convey and vest that right and title, so that the United States had no right or title thereto as against the Osage Tribe thereafter, and the state of Oklahoma received none when it was admitted into the Union. In opposition to these views counsel for the state cite in support of their contention that the Arkansas river at the locus in quo is navigable in law, although not so in fact, and that the state took the title to the leased premises in controversy on its admission into the Union, and we have read and examined, among others, the following authorities: State v. Nolegs, 40 Okl. 479, 139 Pac. 943; State v. Akers, 92 Kan. 169, 140 Pac. 637, Ann. Cas. 1916B, 543; United States v. Mackey (D. C.) 214 Fed. 137; Wear v. State of Kan., 245 U. S. 154, 38 Sup. Ct. 55, 62 L. Ed. 214, Ann. Cas. 1918B, 586; Dana v. Hurst, 86 Kan. 947, 122 Pac. 1041; State v. Wabash Paper Co., 21 Ind. App. 167, 48 N. E. 653, 51 N. E. 949, 950; Martin v. Waddell, 16 Pet. 367, 368, 10 L. Ed. 997; Ill. Cent. Ry. Co. v. Illinois, 146 U. S. 387, 13 Sup. Ct. 110, 36 L. Ed. 1018; Case v. Toftus (C. C.) 39 Fed. 730, 5 L. R. A. 684; Wood v. Hustis, 17 Wis. 417, 418; United States v. Chandler-Dunbar Water Power Co., 229 U. S. 53, 57, 33 Sup. Ct. 667, 57 L. Ed. 1063; Weber v. Harbor Commissioners, 85 U. S. (18 Wall.) 57, 21 L. Ed. 798; Hinman v. Warren, 6 Or. 409; McGilvra v. Ross, 215 U. S. 70, 30 Sup. Ct. 27, 54 L. Ed. 95; In re Horicon Drainage District, 136 Wis. 227, 116 N. W. 12. In State v. Nolegs, State v. Akers, and United States v. Mackey the claims adverse to those of the state to rights or titles to the bed of the Arkansas river below high-water mark were derived from grants or conveyances made before the respective states were admitted. But it seems to us that in those cases insufficient consideration and weight were given to the existing law, the facts and circumstances surrounding the parties to the original grants by the United States at the times they were made respectively, to the intentions of the parties to those grants at those times evidenced by the grants themselves and the circumstances surrounding the parties, and to the rules for the interpretation and application of treaties, contracts, and transactions between the United States and Indian

tribes. Wear v. Kansas, 245 U. S. 154, 38 Sup. Ct. 55, 62 L. Ed. 214, Ann. Cas. 1918B, 586, upon which much reliance seems to be placed, is not decisive or persuasive upon the real question at issue here, the question whether or not grants by the treaties, the patent thereunder, an act of Congress and a deed from the Cherokee Nation to the Osage Tribe, all made when the law and fact were that the river was unnavigable, must be adjudged void because more than 70 years after the original grant and more than 30 years after the conveyance of the rights thereunder to the Osage Tribe the Supreme Court of a state admitted in 1907 adjudged that river to be navigable at law while it remained unnavigable in fact. There is a wide and radical difference between the construction and effect that ought to be given to such grants conditioned by the navigability of a stream and to the customary patents of the United States so conditioned issued under general laws and the respective states of the law on this subject in later years. In the Wear Case the claimant adverse to the state relied upon the usual patent issued under the general laws by the United States in 1860. The only question really decided by the Supreme Court was that, where the highest tribunal of a state, in that case of the state of Kansas, "takes upon itself to know without evidence whether the principal river of the state is navigable at the capitol of the state, we certainly cannot pronounce it error." . In that case the record before the Supreme Court of the United States did not require it to and it did not consider whether or not on all the evidence and the law that eminent counsel could assemble the river was navigable at the time of the grant under the facts and the law then applicable as the court below was required to do in this case and as this court must do. It would be a futile task to review the other authorities which counsel for the state have cited. Most of the claims for title to the beds of rivers below high-water mark adverse to the claims of the states disclosed by them accrued after the admission of the states, under general laws, and have little relevancy to the question in the case at bar. Some of them involve the extent of the jurisdiction of the United States over navigable streams under its power to regulate commerce. In many of them the crucial questions conditioned the rights in beds of rivers concededly navigable, while the grants here involve rights in a stream which was never navigable in fact and whose navigability as a matter of law at the time of the grants conditioned their extent and validity. The study of the question in hand has not been confined to the authorities which have been referred to in this opinion, or to those cited in the briefs and arguments; and the result of our investigation and deliberation is that nothing has been discovered which convinces that the following propositions are not sustained by the evidence in this case, the better reasons and the weight of authority, or that they are not decisive of the questions under discussion and of this case.

[4] The United States has always been both sovereign and proprietor in its territories. As such it has always had the right and power to dispose absolutely of any of its public land therein, high or low, wet or dry. While it has held its public lands in its territories below high-water mark under navigable waters in trust for future states, while it

has not conveyed them by general laws and has acted upon the policy, unless in some case of international duty or public exigency, of leaving the administration and disposition of the sovereign rights in navigable waters and in the soil under them to the control of future states when they should be admitted to the Union, nevertheless it has always possessed and has frequently exercised the absolute power to grant such lands and any interest it had in them irrevocably whenever it became necessary to do so to perform international obligations or to carry out other public purposes appropriate to the objects for which it has held the lands in its territories. Shively v. Bowlby, 152 U. S. 1, 48, 58, 14 Sup. Ct. 548, 38 L. Ed. 331; McGilvra v. Ross, 215 U. S. 70, 79, 30 Sup. Ct. 27, 54 L. Ed. 95; Goodtitle v. Kibbe, 9 How. 471, 478, 13 L. Ed. 220; San Francisco City and County v. Le Roy, 138 U. S. 656, 670, 671, 11 Sup. Ct. 364, 34 L. Ed. 1096; Knight v. U. S. Land Association, 142 U. S. 161, 183, 184, 12 Sup. Ct. 258, 35 L. Ed. 974; Winters v. United States, 207 U. S. 564, 576, 577, 28 Sup. Ct. 207, 52 L. Ed. 340; United States v. Winans, 198 U. S. 371, 381, 25 Sup. Ct. 662, 49 L. Ed. 1089; United States v. Romaine, 255 Fed. 253, 260, 166 C. C. A. 423, 430; Alaska Pacific Fisheries v. United States, 248 U. S. 78, 87, 88, 90, 39 Sup. Ct. 40, 63 L. Ed. 138.

[5] It has never held its public lands in the territories under unnavigable waters under any such trust, but it has always had and exercised the absolute right to grant and dispose of such lands absolutely as appurtenant to and parts of the property granted or conveyed by it to the riparian owners of the banks adjacent thereto according to the existing law upon the subject of the rights of riparian owners at the times of the respective grants. Such riparian grantees and owners under the acts of Congress and under the law applicable in 1838, 1872, and 1883 at the place where these leased premises lie became the owners of the beds of unnavigable streams to the respective threads thereof. R. S. § 2476 (U. S. Comp. Stat. § 4918); Railroad Co. v. Schurmeier, 7 Wall. 272, 287, 19 L. Ed. 74. Such a riparian right of the owner of the bank to the bed of the stream was a valuable one of which, "when once vested, the owner can only be deprived in accordance with established law, and if necessary that it be taken for the public good, upon due compensation." Yates v. Milwaukee, 77 U. S. (10 Wall.) 497, 504. The United States by its patent of 1838, in performance of its treaties with the Cherokee Nation, granted and guaranteed to that nation a tract of land which included the banks on both sides of the Arkansas river at the place of the leased property here in controversy, and that grant conveyed the bed of the river between these banks. Donnelly v. United States, 228 U. S. 243, 259, 33 Sup. Ct. 449, 57 L. Ed. 820, Ann. Cas. 1913E, 710. According to the law applicable to the subject and to this grant when it was made, the test of the navigability of the river was its navigability in fact, and it is not now and never has been so navigable. There was not at the time of the original grant in 1838 or when the title thus granted was vested in the Osage Tribe under the act of 1872 and the deed of 1883 any general or local law conditioning these grants to the effect that the Arkansas river at the place of the leased premises, though unnavigable in fact, was

navigable in law. Those grants therefore divested the United States of all right and title to that part of the bed of the Arkansas river here in controversy and vested that right and title in the Osage Tribe. When the state of Oklahoma in 1907 came into the Union the United States had no beneficial right, title, or interest in that portion of the leased premises here in controversy, the state of Oklahoma never received or had any such right or interest, there was no error of law or of fact in the decision of the court below, and its judgment must be affirmed. It is so ordered.