## LESTER KEETER v. STATE.

No. A-3558.    Opinion Filed April 18, 1921.
Rehearing Denied May 16, 1921.
(196 Pac. 970.)

(Syllabus.)

1. **States — South Bank of Red River as Boundary of Oklahoma.** That the south or right bank of Red river, and not the middle channel of the river, is the Texas-Oklahoma boundary is shown by the Spanish-American Treaty of February 22nd, 1819 (8 Stat. L. 252), making the south bank of Red river the boundary, and providing that said river throughout the course described should belong to the United States; by the Mexican-American Treaty of January 12, 1828 (8 Stat. at L. 372); by an act passed December 19, 1836, by the Congress of Texas recognizing the same boundary (Laws of the Republic 1836, p. 133); by the act of Congress passed in 1845, admitting Texas into the Union (9 Stat. at L. 108); by act of Congress passed May 2, 1890 (Organic Act), describing the boundaries of Oklahoma Territory and of Indian Territory (26 Stat. at L. 81); by act of Congress (Enabling Act) admitting Oklahoma into the Union (34 Stat. at L. 267); and by the Constitution adopted by the people of Oklahoma.

2. **Same—Jurisdiction—Navigable Waters.** Upon the admission of Oklahoma into the Union "on an equal footing with the original states," the state has the same rights, sovereignty, and jurisdiction over the navigable waters as the original states, and

the title of the navigable waters and the soil beneath them, which has been temporarily held by the United States, passed to the state, and is subject to its sovereignty and jurisdiction.

Appeal from County Court, Jefferson County; E. L. Dillard, Judge.

Lester Keeter was convicted of unlawful possession of intoxicating liquors, and appeals. Affirmed.

Bridges & Vertrees and J. H. Harper, for plaintiff in error.

The Attorney General and W. C. Hall, Asst. Atty. Gen., for the State.

DOYLE, J. Upon an information charging that the defendant, Lester Keeter, did, in Jefferson county, have in his possession intoxicating liquors, to wit, whisky, with the intent to sell, give away, and otherwise furnish the same, and to convey the same, in violation of the prohibitory liquor laws of the state, the plaintiff in error was tried and convicted and his punishment fixed at confinement in the county jail for three months and a fine of $500. From the judgment, rendered April 12, 1919, upon such conviction, he appeals.

The undisputed evidence for the state shows that on the night of the date alleged the defendant, Lester Keeter, from some point in the state of Texas, drove an automobile on to the ferryboat at Heartsfield's Ferry, on Red river, about seven miles west of Waurika, in Jefferson county; that the boat was at the water's edge on the Texas side; that, observing two deputy sheriffs of Jefferson county on the Oklahoma side of the river, he backed his automobile off the ferryboat, and about 75 feet from the boat his car stalled; the officers crossed the river and found him standing by his car and 15 sacks of whisky on the sand bar about 70 feet from the car; that the defendant was seen to carry something from the car after it stalled to where the whisky was found. At that time

the bed of Red river was about three-quarters of a mile wide, the channel was about 200 feet wide, and swept along the left or north bank.

When the state rested, counsel moved for a dismissal upon the ground that the testimony shows that the alleged offense, if committed at all, was committed beyond the jurisdiction of this court, which motion was overruled and exception allowed.

Among the instructions given by the court and excepted to by the defendant was that the south boundary of Jefferson county, Okla., is the south bank and the meanderings thereof of Red river.

Instructions were asked on behalf of the defendant informing the jury that where a river is the common boundary between two states, the jurisdiction to enforce the laws of such states extends only to the middle of the stream, and that neither state is authorized to prosecute a person for an act done upon the waters of the river upon the opposite side of the river unless Congress grant consent to concurrent jurisdiction by interstate compact.

The same jurisdictional question was again raised in the motions for new trial and in arrest of judgment. It is contended in behalf of the plaintiff in error that the testimony failed to prove that the place where the alleged offense was committed was in the state of Oklahoma, and it is urged:

"That the fact as to where the boundary of Oklahoma extends to on Red river is dependent upon the question whether or not Red river is a navigable stream, and that this question is exclusively in the jurisdiction of the federal courts, and that if Congress, in the act creating the territory of Oklahoma or the Enabling Act admitting the state, did not confer jurisdiction, civil and criminal, over the river or concurrent jurisdiction has not been secured by compact entered into between the states of Oklahoma and Texas, with the consent of Congress, then each state can only exercise such jurisdiction to

the middle of the stream''—citing State v. Cunningham, 102: Miss. 237, 59 South. 76, 34 Ann. Cas. 1914D, 782; Spears v. State, 8 Tex. App. 467; Parsons v. Hunt, 98 Tex. 420, 84 S. W. 644.

The question presented by the record is whether the middle of the channel of Red river, or the south bank thereof, is the boundary line between Oklahoma and Texas. If the south bank is the boundary line, the undisputed evidence of the state shows that the offense charged was committed in the state of Oklahoma.

In the last case cited above, the Supreme Court of Texas, held that ''the state of Texas has jurisdiction over the waters of Red river, which forms the boundary between it and the Indian Territory to the center of the stream,'' following the opinion of the Texas Court of Criminal Appeals, in the case of Spears v. State, supra, wherein it was held that, under ''the treaty of 1819 between the United States and Spain, which fixed the Rio Roxo of Nachitoches, or Red river, as one of the boundaries between the two nations,'' the jurisdiction of Texas, extends at least to the middle of Red river. It appears from the opinion, the decision is based upon the theory that the treaty ''is silent as to which bank of said stream should constitute the boundary,'' and the general rule that the mere designation of a river as a boundary, in the absence of a further description, means the channel or middle of the stream.

That these decisions are based upon a misapprehension of the provisions of the treaty of 1819 is apparent from the language of the treaty construed in the light of the diplomatic correspondence that preceded the making of the same, which may be found in the opinion of the Supreme Court of the United States in the case of United States v. Texas, 162 U. S. 1, 16 Sup. Ct. 725, 40 L. Ed. 867; this being the case decisive of the controversy between the United States and the state of Texas over the jurisdiction of Greer county. It will be seen therefrom that, following the purchase of Louisiana in 1803, negotiations

pended for some time between the United States and Spain to settle the boundary question, and one of the points of negotiations was as to the boundary line along the Sabine and Red rivers. Finally, Mr. Adams, Secretary of State, submitted a proposition to the Spanish minister, among other points, proposing that the boundary line between the two countries west of the Mississippi should begin on the Gulf of Mexico, at the mouth of the River Sabine, continuing north along the western bank of that river to the thirty-second degree of latitude; thence by a line due north to the Rio Roxo or Red river; thence following the course of the said Red river westward to the 102nd meridian of longitude, then crossing the said Red river, thence due north to the River Arkansas, the Sabine and Red rivers and all islands in the same throughout the course described to belong to the United States, and that the western bank of the Sabine and the southern bank of Red river should be the limit of the jurisdiction of Spain. The Spanish minister required that "the boundary between the two countries shall be the middle of the rivers, and that the navigation of the said rivers shall be common to both countries."

Mr. Adams replied that the United States had always intended that "the property of the rivers should belong to them," and he insisted on that point, "as an essential condition, as the means of avoiding all collision, and as a principle adopted henceforth by the United States in its treaties with its neighbors." He agreed, however, "that the navigation of the said rivers to the sea shall be common to both people." The Spanish minister assented to this, and the result was the treaty signed on February 22, 1819.

The third article of the treaty reads:

"Art. 3. The boundary line between the two countries, west of the Mississippi, shall begin on the Gulf of Mexico, at the mouth of the River Sabine, in the sea, continuing north, along the western bank of the river to the 32nd degree of lati-

tude; thence, by a line due north, to the degree of latitude where it strikes the Rio Roxo of Nachitoches, or Red river; then following the course of the Rio Roxo westward, to the degree of longitude 100 west from London and 23 from Washington; then, crossing the said Red river, and running thence, by a line due north, to the River Arkansas; thence, following the course of the southern bank of the Arkansas, to its source, in latitude 42 north; and thence, by that parallel of latitude, to the South sea. The whole being as laid down in Melish's map of the United States, published at Philadelphia, improved to the 1st of January, 1818. But, if the source of the Arkansas river shall be found to fall north or south of latitude 42, then the line shall run from the said source due south or north, as the the case may be, till it meets the said parallel of latitude 42, and thence, along the said parallel, to the South sea: All the islands in the Sabine, and the Red and Arkansas rivers, throughout the course thus described, to belong to the United States; but the use of the waters, and the navigation of the Sabine to the sea, and of the said rivers Roxo and Arkansas, throughout the extent of said boundary, on their respective banks, shall be common to the respective inhabitants of both nations.''

The treaty may be found in full in 8 Stat. at L. 252, 254, 256.

By the treaty of 1828 between the United States of America and the United Mexican States, concluded January 12, 1828, the dividing limits of the respective countries were declared to be the same as those fixed by the treaty of 1819.   8 Stat. at L. 372.

The Republic of Texas, by an act passed December 19, 1836, declared that the civil and political jurisdiction of that Republic extended to the boundaries therein described, and accepted the boundary line with the United States in this particular as declared in the said treaty between Spain and the United States.  1 Sayles, Early Laws of Texas, art. 257.

By a joint resolution passed March 1, 1845, Congress consented that ''the territory properly included within and rightfully belonging to the Republic of Texas'' might be erect-

ed into a state to be admitted into the Union, one of the conditions of such consent being that the new state be formed subject to the adjustment by the United States of all questions of boundary that might arise with other governments. 5 Stat. at L. 797. The conditions prescribed were accepted by Texas. 1 Sayles, Early Laws of Texas, art. 1531. And by the joint resolution of Congress approved December 29, 1845, Texas was admitted as one of the states of the Union, on an equal footing in all respects with the original states. 9 Stat. at L. 108.

The Organic Act, approved May 2, 1890, 26 Stat. at L., p. 81, described the boundaries of Oklahoma Territory and of the Indian Territory as that part of the United States which is bounded on the north by the states of Colorado and Kansas, on the east by the states of Arkansas and Missouri, on the west by the state of Texas and territory of New Mexico, and on the south by the state of Texas. By act approved June 16, 1906, as amended March 4, 1907, 34 Stat. at L. 267, 1286, Oklahoma was admitted to the Union "on an equal footing with the original states." By section 1 of the Enabling Act, it was provided: "That the inhabitants of all that part of the area of the United States now constituting the territory of Oklahoma and the Indian Territory, as at present described, may adopt a Constitution and become the state of Oklahoma." In article 17 of the Constitution, the boundaries of Jefferson county are described at this point as "the state line between Texas and Oklahoma."

In the case of DeLoney v. State, 115 S. W. 138, the Supreme Court of Arkansas passed on the question here presented, and held:

"That the south bank of the Red River, and not the thread of the stream, is the Texas-Arkansas boundary, is shown by the Spanish-American treaty of February 22, 1819 (8 Stat. 252, et seq.), making the Red River a boundary, and providing that the river should belong to the United States; by the Mexican-American treaty of January 12, 1828 (8 Stat. 372); by Act Cong. June 15, 1836, ch. 100, 5 Stat. 50; Const. Ark. 1836,

art. 1, and subsequent constitutions; by an act passed by the Congress of Texas in 1836 (Laws of the Republic of 1836, p. 133) recognizing the same boundary; and by the Act of Congress passed in 1845 (Act of March 1, 1845, 5 Stat. 797), admitting Texas and describing its territory as being that belonging to the Republic of Texas.''

The court, speaking through Chief Justice Hill, said:

''It is clear from the Act of Congress admitting the state (of Arkansas) and the Constitution of the state that all of Red river at this point was intended to be included within this state, and the court might well stop at that point, for this is a settled principle: 'A question like this respecting the boundaries of nations, is, as has been truly said, more of a political than a legal question; and, in its discussion, the courts. of every country must respect the pronounced will of the legislature.' United States v. Texas, 143 U. S. 621, 12 Sup. Ct. 488, 36 L. Ed. 285. But as the Texas Court of Appeals had reached the conclusion that the jurisdiction of that state extended to the thread of Red river, it has been thought best to point out wherein that court erred in applying the general rule which it did in reaching that conclusion. These treaties between the United States and Spain, and between the United States and Mexican States, and the acquiescence therein by the Republic of Texas  and the state of Texas, demonstrate that the boundary line was the south bank of Red river, and not the thread of the stream; and this  jurisdictional line was. adopted when Arkansas was admitted into the Union and is embedded in its Constitution.''

That the south or right bank of Red river from the 100th meridian of longitude to the state line of Arkansas, and not the middle of the channel, is the Texas-Oklahoma boundary is. shown by the treaty of February 22, 1819, between the United States and Spain; by treaty of January 12, 1828, between the United States and Mexico; by an act passed December 19,. 1836, by the Congress of the Republic of Texas, accepting the boundary line with the United States in this particular; by act

of Congress passed March 1, 1845, admitting Texas into the Union; by the act of Congress (Organic Act) defining the boundaries of Oklahoma Territ⬛⬛and of the Indian Territory, and by the act of Congress admitting Oklahoma into the Union on an equal footing with the original states.

It follows that the jurisdiction of Oklahoma extends to the south bank of said Red river.

The jurisdiction of the state of Oklahoma over Red river, where the south bank constitutes the boundary, in no way depends upon the fact as to whether such river is navigable or non-navigable. In passing upon the effect of the act admitting Alabama into the Union, the Supreme Court of the United States held in the case of Pollard v. Hagan, 3 How. 212, 11 (U. S.) L. Ed. 565, that the state had the same right, sovereignty and jurisdiction over the navigable waters as the original states, and could exercise all the powers of government which belonged to and may be exercised by them, excepting with respect to control over public lands owned by the United States; and that the title of the navigable waters and the soil beneath them was in the state and subject to its sovereignty and jurisdiction. Kansas v. Colorado, 206 U. S. 46, 51 L. Ed. 956; Donnelly v. U. S., 228 U. S. 243, Ann. Cas. 30, 1913C, 710; State v. Akers, 92 Kan. 169, 140 Pac. 637, Ann. Cas. 40, 1916B, 543.

The Supreme Court of this state in the case of State v. Nolegs, 40 Okla. 479, 139 Pac. 943, held:

"The ownership of the navigable waters and the soil under them in all the territory embraced in the Louisiana Purchase, was held in trust by the federal government, and as each of the states was created, the same, within the boundaries of such state, passed to it and the absolute right to such navigable waters and the soil thereunder is in the state, subject to the public rights and the paramount power of Congress over navigation."

Upon the whole case we are of opinion that the evidence is amply sufficient to sustain the verdict, and finding no re-

versible error in the record, the judgment is affirmed.

MATSON and BESSEY, JJ., concur.