**UNITED STATES v. ELLIOTT et al.**

No. 2473.

Circuit Court of Appeals, Tenth Circuit.

Nov. 9, 1942.

John P. Hearne, Atty., Dept. of Justice, of Washington, D. C. (Norman M. Littell, Asst. Atty. Gen., and Whitfield Y. Mauzy, U. S. Atty., and Chester A. Brewer, Asst. U. S. Atty., both of Tulsa, Okl., and Vernon L. Wilkinson, Atty., Dept. of Justice, of Washington, D. C., on the brief), for the United States.

Clyde Morsey, of Miami, Okl., for appellees, James W. Elliott, Lena Elliott, Clyde Morsey, and Susanne Morsey.

Robert L. Davidson, of Tulsa, Okl. (Edward P. Marshall and Jesse L. Ballard, both of Vinita, Okl., on the brief), for Grand River Dam Authority.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

This is an appeal by the United States from a judgment awarding compensation in a condemnation proceeding. The proceeding was instituted by the Grand River Dam Authority to condemn approximately 40 acres of land, known as Turkey Island,[1] situated within the reservoir area of the Grand River Dam in Oklahoma. The island lies east of the middle of the river. Both the Cherokee and Seneca Nations claim ownership of the island and claims for compensation were filed by the United States on behalf of both tribes. Commissioners were appointed to appraise the island. They returned an award of $2,960, which was confirmed by the trial court.

A stipulation of facts upon which the respective claims to title were based was filed.

By the terms of the treaty of February 28, 1831, 7 Stat. 348, the tribe of Seneca Indians, residing on Sandusky River, in the state of Ohio, ceded their Ohio lands to the United States and the United States in consideration thereof ceded to such tribe a tract of land extending westwardly from the western boundary of the state of Missouri, across that portion of the Grand River in which the island is situated, being seven miles from north to south and fifteen miles from east to west, and containing 67,000 acres.

By the treaty of July 20, 1831, 7 Stat. 351, the Seneca and Shawnee Indians, residing at and around Lewistown, in the state of Ohio, ceded their Ohio lands to the United States and the United States in consideration thereof ceded to such tribes a tract of land containing 60,000 acres and lying westerly from the lands granted to the Senecas of Sandusky.

It appears from the treaty of December 29, 1832, 7 Stat. 411, that after the United States had ceded the lands referred to and described in the treaties of 1831, the Senecas of Sandusky and the Shawnees of Lewistown became desirous of uniting as a tribe or nation, to be known as the "United Nation of Senecas and Shawnees," and to occupy their lands as tenants in common and to "have the whole of the country provided for them by the United States located on the east side of Ne-o-sho or Grand river, which runs through and now divides the same." The treaty of December 29, 1832, contained the following provisions:

"Article I. The United Tribe of Senecas and Shawnee Indians do hereby cede, relinquish and forever quit claim to the United States, all the land granted to them on the *west side of Ne-o-sho or Grand river*, by treaties made respectively with the Senecas of Sandusky and the mixed Band of Senecas and Shawnees of Lewistown, Ohio, on the 20th day of July, 1831, and on the 28th day of February, 1831.

---

[1] Hereinafter called the island.

"Article II. In consideration of said lands, described and ceded as aforesaid, the United States will grant, by letters patent, to the Tribe or Nation of Indians aforesaid, * * * the following tract of land lying on the *east side* of Ne-o-sho or Grand river, viz: bounded on the east by the west line of the State of Missouri; south by the present established line of the Cherokee Indians; *west by Ne-o-sho or Grand river;* and north by a line running parallel with said south line, and extending so far from the present north line of the Seneca Indians from Sandusky, as to contain sixty thousand acres, exclusive of the land now owned by said Seneca Indians, *which said boundaries include, however, all the land heretofore granted said Senecas of Sandusky, on the east side of Grand river."* (Italics ours.)

Thus, it will appear that the Senecas, having been ceded a tract of land which extended across the Grand River and embraced the island, ceded, relinquished, and quitclaimed to the United States all the land granted to them "on the west side of Ne-o-sho or Grand river."

The patents referred to in the treaty of December 29, 1832, were never issued.

The lands ceded to the Senecas and not relinquished to the United States were subsequently allotted in severalty to the members of the United Nation, the allotments being made under and pursuant to the terms of the General Allotment Act, 24 Stat. 388, 25 U.S.C.A. § 331 et seq.

Under a treaty of May 6, 1828, the United States had ceded 7,000,000 acres of land to the Cherokees. 7 Stat. 311. It was discovered that the southern part of this 7,000,000-acre grant included a portion of the country which the Creek Indians had a prior right to select and did select under their treaty of January 24, 1826. 7 Stat. 286; Royce, Indian Land Cessions in the United States (1900), p. 745. In order to make adjustment for the Creek selection of part of the lands within the 1828 grant, by a treaty of February 14, 1833, 7 Stat. 414, entered into with the Cherokee Nation, an additional grant was made to the Cherokees which extended their lands northward. The boundary line of the additional grant, in so far as it is here material, reads as follows: "thence along the western Missouri line, to the land assigned the Senecas; thence, on the south line of the Senecas to Grand river; thence, up said Grand river, as far as the south line of the Osage reservation."

In a subsequent treaty of December 29, 1835, 7 Stat. 478, the Cherokee Nation was ceded an additional tract of land, and in Art. 3 of the 1835 treaty it was provided that the whole of the ceded lands should be embraced in one patent executed to the Cherokee Nation. The patent issued December 31, 1838. It reflects a previous survey and contains, among others, the following descriptive recital:

"* * * to the southwest corner of the State of Missouri, thence north on the western boundary of the State of Missouri, * * * to the north bank of the Cowskin or Seneca river * * *; thence west on the southern boundary on the lands of the Senecas eleven miles forty-eight chains to a post on the east bank of the Neosho river from which a maple eighteen inches in diameter bears south thirty-one degrees east seventy-two links, thence up the Neosho river with its meanderings on the east bank to the southern boundary of the Osage lands * * * witnessed by a mound of rocks on the west bank of the Neosho river, * * *."

Lena Elliott and Clyde Morsey presented a claim of ownership predicated on two grounds: (1) that the Senecas originally owned the island, and that title had passed to Elliott and Morsey by mesne conveyances, the first being a deed dated January 24, 1903, from the Seneca Nation to John M. Bayless conveying the island as a part of the surplus Seneca lands, and (2) through the purchase of Cherokee riparian lands which had been allotted along the west bank of the Grand River opposite the island.

The trial court adjudged that the island was a part of the original grant to the Senecas, remained within the Seneca grant after the treaty of December 29, 1832, and had passed by mesne conveyances to Elliott and Morsey, and that Elliott and Morsey, together with their respective spouses, owned the island at the time of the condemnation. It further adjudged that the Elliotts and Morseys had succeeded to any rights the Cherokee Nation might have had as an incident to the ownership of riparian land lying west of the island.

Thereafter, the court disbursed $1,195 of the award to the Elliotts and Morseys, pursuant to a contract of direct purchase which the Authority had entered into with

the Elliotts and Morseys, and repaid to the Grand River Dam Authority $1,765.

The treaty of February 28, 1831, vested good title in the Senecas of Sandusky to that portion of the Grand River in which the island is situated without the issuance of the patent provided for in the treaty.[2]

Since the treaties with the Senecas in 1831 and 1832 preceded in time the 1833 treaty with the Cherokee Nation, the case turns on the construction of the treaty with the Senecas in 1832. The 1832 treaty relinquished to the United States "all the land granted to them on the west side of Ne-o-sho or Grand river" and the United States agreed to issue a patent to the Senecas of a tract of land "lying on the east side of Ne-o-sho or Grand river, viz: bounded on the east by the west line of the State of Missouri; south by the present established line of Cherokee Indians; west by Ne-o-sho or Grand river; and north by a line running parallel with said south line."

That portion of the Grand River which runs through the tract granted to the Senecas by the treaty of February 28, 1831, was not navigable.

In State of Oklahoma v. State of Texas, 258 U.S. 574, 594, 42 S.Ct. 406, 414, 66 L. Ed. 771, the court said:

"Where the United States owns the bed of a nonnavigable stream and the upland on one or both sides, it, of course, is free when disposing of the upland to retain all or any part of the river bed; and whether in any particular instance it has done so is essentially a question of what it intended. If by a treaty or statute or the terms of its patent it has shown that it intended to restrict the conveyance to the upland or to that and a part only of the river bed, that intention will be controlling; and, if its intention be not otherwise shown, it will be taken to have assented that its conveyance should be construed and given effect in this particular according to the law of the state in which the land lies.

Where it is disposing of tribal land of Indians under its guardianship the same rules apply."

At the time the United States made the grant to the Seneca and Shawnee Indians, the lands granted were not within a state or other local jurisdiction. The grant, therefore, was not subject to local law. It must be construed in accordance with the principles of the common law and the decisions of the United States Supreme Court.[3] Moreover, the common law of England was put in force in the Indian Territory by the Act of Congress of May 2, 1890, 26 Stat. 81, 94, Kappler's Indian Affairs Laws and Treaties, Vol. 1, 2d Ed., pp. 48, 49, through the adoption of ch. 20 of Mansfield's Digest of the Statutes of Arkansas, 1884, as the law of the Indian Territory. Under the common law and the decisions of the United States Supreme Court, a grant of land bounded on a nonnavigable river carries the exclusive right and title of the grantee to the center of the stream, unless the terms of the grant clearly denote the intention to stop at the edge or margin of the river.[4]

Under the common law as construed by the Supreme Court of Arkansas, the title of a riparian owner extends to the thread of a nonnavigable stream.[5]

The clause "all the land granted to them on the west side of Ne-o-sho or Grand river" and the clause "lying on the east side of Ne-o-sho or Grand river" in the description of the land to be patented to the Senecas under the treaty of 1832 should receive the same construction. There is nothing in the treaty to indicate that the former was intended to embrace the whole of the Grand River and that the latter was intended to exclude the whole of the Grand River. Neither is there anything in the treaty to indicate that the lands remaining to the Senecas should stop at the edge or margin of the river. Indeed, the language of the relinquishment to the United States is limited to the prior grant "on the west side of Ne-o-sho or Grand

2 Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77, 83, 43 S.Ct. 60, 67 L.Ed. 140; Jones v. Meehan, 175 U.S. 1, 10, 20 S.Ct. 1, 44 L.Ed. 49; Francis v. Francis, 203 U.S. 233, 237, 238, 27 S.Ct. 129, 51 L.Ed. 165.

3 United States v. Romaine, 9 Cir., 255 F. 253, 259.

4 St. Paul & P. R. Co. v. Schurmeir, 7 Wall. 272, 287, 19 L.Ed. 74; Brown v.

Huger, 21 How. 305, 320, 16 L.Ed. 125; Hardin v. Jordan, 140 U.S. 371, 383, 11 S.Ct. 808, 838, 35 L.Ed. 428; State of Indiana v. Milk, C.C.Ind., 11 F. 389, 395; United States v. Hayes, 8 Cir., 20 F.2d 873, 877; 9 C.J. p. 187, § 65.

5 Little v. Williams, 88 Ark. 37, 113 S. W. 340, 343; Harrison v. Fite, 8 Cir., 148 F. 781, 783.

river." At most, it can only be construed as a relinquishment west of the center of the stream. Clearly, the parties intended that the Senecas should receive a patent for all the lands embraced in the original grants not relinquished. We conclude, therefore, that the treaty of February 28, 1831, granted the island to the Senecas of Sandusky and that since the island lies east of the center of the stream, it was not relinquished to the United States by the treaty of December 29, 1832.

It follows that the Senecas had title when the treaty of February 14, 1833, was entered into with the Cherokee Nation.

It may be unnecessary to determine whether it was intended by the Cherokee treaty of February 14, 1833, to embrace that portion of Grand River east of the central line theretofore granted to the Senecas. The language of the treaty is "thence, on the south line of the Senecas to Grand river; thence, up said Grand river." The grant to the Cherokee Nation embraced land lying westward from the Grand River. The Grand River, under the Cherokee treaty, constituted a portion of the eastern boundary line of the grant. There is nothing in the treaty to indicate an intent to grant the whole of the river to the Cherokee Nation.

The primary basis for the grant to the Cherokee Nation was the treaty. The patent was only a confirmation thereof.

■ Ordinarily, a meander line merely determines the sinuosities of the stream and is not a boundary.[6]

■ Assuming, without deciding, that, as counsel for the United States contend, the patent to the Cherokee Nation was an executive determination that the eastern boundary line of the Cherokee grant was the east bank of the river, it could not deprive the Senecas of land previously granted to them and not relinquished.[7]

Furthermore, the Acting Secretary of the Interior on July 25, 1871, in determining a controversy concerning the right claimed by the Cherokee Nation to the exclusive control of Grand River in the Indian Territory including ferry privileges on both banks of such river, held the middle of Grand River to be the boundary of the Cherokee Nation.

We conclude the decision of the trial court was right and the judgment is accordingly affirmed.

---

[6] Hardin v. Jordan, 140 U.S. 371, 380, 11 S.Ct. 808, 35 L.Ed. 428; St. Paul & P. R. Co. v. Schurmeir, 7 Wall. 272, 286, 287, 19 L.Ed. 74; Whitaker v. McBride, 197 U.S. 510, 512, 25 S.Ct. 530, 49 L.Ed. 857; Producers' Oil Co. v. Hanzen, 238 U.S. 325, 339, 35 S.Ct. 755, 59 L.Ed. 1330; United States v. Hayes, 8 Cir., 20 F.2d 873, 877.

[7] Commissioners v. United States, 8 Cir., 270 F. 110, 112.