UNITED STATES v. CHAMPLIN RE-
FINING CO. et al.

No. 3159.

Circuit Court of Appeals, Tenth Circuit.
July 29, 1946.

Rehearing Denied Aug. 29, 1946.

Fred W. Smith, Atty., Dept. of Justice, of Washington, D.C. (J. Edward Williams, Acting Head, Lands Div., Dept. of Justice, of Washington, D.C., Whit Y. Mauzy, U. S. Atty., of Tulsa, Okl., and Roger P. Marquis, Atty., Dept. of Justice, of Washington, D.C., on the brief), for appellant.

Nathan Scarritt and Harry O. Glasser, both of Enid, Okl. (Mac Q. Williamson, Atty. Gen., Randall S. Cobb, Atty. Gen., J. Walker Field, Asst. Atty. Gen., Walter Marlin, Law and Exe. Counsel for the Commissioners of the Land Office, State of Oklahoma, of Oklahoma City, Okl., and E. S. Champlin, of Enid, Okl., on the brief), for appellees.

Coleman Hayes, of Oklahoma City, Okl., R. B. F. Hummer and D. E. Hodges, both of Bartlesville, Okl., Edward Howell, of Tulsa, Okl., E. R. McNeill, of Pawnee, Okl., N. E. McNeill, of Tulsa, Okl., J. A. McCollum, of Pawnee, Okl., and Roy C. Lytle, of Oklahoma City, Okl., amici curiae.

Before PHILLIPS and MURRAH, Circuit Judges, and KENNAMER, District Judge.

PHILLIPS, Circuit Judge.

This is an appeal from a decree adjudging that the State of Oklahoma is the owner of the south half of the Arkansas River bed, in Oklahoma, adjoining four riparian tracts of land, which tracts the United States holds under trust patents for the benefit of certain of its Pawnee and Otoe Indian wards, and that the Champlin Refining Company has a valid and subsisting oil and gas lease upon such south half of the river bed.

The United States originally acquired title to the land in suit as part of the Louisiana Purchase. Under treaties of May 6, 1828,[1] February 14, 1833,[2] and December

---

[1] 7 Stat. 311. [2] 7 Stat. 414.

29, 1835,[3] the United States, by deed dated December 31, 1838, conveyed to the Cherokee Nation a large tract of land on both sides of the bed of the Arkansas River, embracing the south half of the river bed here in suit. By the treaty of July 19, 1866,[4] the Cherokee Nation agreed that the United States might settle friendly Indians upon that part of the Cherokee lands known as the Cherokee Outlet, which embraced the portions of the river bed here in suit. Article 16 of that treaty provided that such lands would be conveyed to the Indians so settled. By treaty of October 28, 1867,[5] a reservation was set aside for the Cheyenne and Arapahoe Indians between the Cimarron and Arkansas Rivers. That reservation embraced the portions of the river bed here in suit. It was expressly extended to the middle of the Arkansas River. The Cheyenne and Arapahoe Indians declined such reservations and relinquished their claim. On June 5, 1872,[6] Congress authorized the Cherokee Nation to convey to the Osage Nation a tract of land described as follows: "Bounded * * * on the south and west by the north line of the Creek country and the main channel of the Arkansas River, * * *" The conveyance was made. It included the land on the opposite side of the river at approximately the location of the four riparian tracts and the title of the Osage Nation to the north half of the river bed was upheld in subsequent litigation between the United States and the State of Oklahoma.[7]

The land on both sides of the Arkansas River at the location of the portions of the river bed here in suit was first surveyed into sections, townships, and ranges in September, 1872. The survey was approved on September 16, 1872.

Two of the riparian tracts are in Township 23 North, Range 4 East of the Indian Meridian. These tracts are held in trust for Pawnee Indians. The other two riparian tracts are located in Township 23 North, Range 3 East of the Indian Meridian. These tracts are held in trust for Otoe Indians.

Under the 1866 treaty with the Cherokees, and pursuant to the Act of March 3, 1881,[8] the Secretary of the Interior designated and assigned for the use and occupation of the Confederated Otoe and Missouria tribes of Indians "that portion of Tp. 23, N. R. 3 E. lying west of the Arkansas River. * * *"[9] Pursuant to the 1886 treaty with the Cherokees, and in conformity with the Act of March 3, 1883,[10] the Cherokee Nation, on June 14, 1883, conveyed to the United States in trust for the use and benefit of the Otoe and Missouria Indians: "Fractional township twenty-three (23) North, range three (3) East of the Indian Meridian; lying and being on the right bank of the Arkansas River, according to a plat of said lands hereto annexed, marked 'A,' and made a part of this conveyance * * *"[11] On November 24, 1906, a trust patent was issued to Ethel Lewis Barnes, an Indian of the Otoe and Missouria tribes, covering the following described land: "the South half and the North East quarter of the South East quarter and the Lot numbered five of Section twenty-four, in Township twenty-three North of Range three East, of Indian Meridian in Oklahoma, containing one hundred and fifty-two acres and twenty hundredths of an acre." The title to such land is now held by the United States in trust for Ethel Lewis Barnes. On June 10, 1907, a trust patent was issued to Anna Robedeaux, an Indian of the Otoe and Missouria tribes, covering the following described land: " * * * Lot numbered six of Section twenty four in Township twenty three North of Range three East of Indian Meridian in Oklahoma, * * *" Title to that land is now held

[3] 7 Stat. 478.
[4] 14 Stat. 799.
[5] 15 Stat. 593, 594.
[6] 17 Stat. 228.
[7] See United States v. Brewer-Elliott Oil & Gas Co., D.C., 249 F. 609; Brewer-Elliott Oil & Gas Co. v. United States, 8 Cir., 270 F. 100; Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77, 43 S.Ct. 60, 67 L.Ed. 140.
[8] 21 Stat. 380.
[9] Other townships, not here involved, were also included.
[10] 22 Stat. 603, 624.
[11] Other townships, not here involved, were also included.

by the United States in trust for the heirs of Anna Robedeaux. Both of these allotments are bounded by the Arkansas River.

By § 4 of the Act of April 10, 1876,[12] there was set aside as a reservation for the Pawnee Tribe of Indians, in accordance with the 1866 treaty with the Cherokees, the following described land: "All that tract of country between the Cinnarron [Cimarron] and Arkansas Rivers embraced within the limits of townships * * * twenty three, * * * of range four east, * * * of the Indian meridian."[13] In accordance with the 1866 treaty with the Cherokees, and pursuant to the provisions of the Act of March 3, 1883,[14] the Cherokee Nation, on June 14, 1883, conveyed to the United States in trust for the use and benefit of the Pawnee Tribe of Indians the following described land: "* * * fractional townships twenty-three (23) * * * north, range four (4) east; * * *"[15] The fractional townships referred to in this deed are described as "* * * the fractional townships being on the right bank of the Arkansas River." By agreement between the Pawnee Tribe and the United States, made November 23, 1892,[16] the Pawnee Tribe ceded and relinquished to the United States its beneficial interest in such reservation. Art. II of such agreement provided for the making of allotments to individual Pawnee Indians. Thereafter, on October 9, 1893, there was issued to Horace Field, a Pawnee Indian, a trust patent covering the following described lands: "The South East quarter of the North West quarter, and the Lots numbered one, two and three of Section nineteen in Township twenty-three North of Range four East of the Indian Meridian, in Oklahoma Territory, containing one hundred and twenty-one acres and sixty-six hundredths of an acre." Title to that tract is now held by the United States in trust for four Indians to whom it passed by descent. On October 9, 1893, a trust patent was issued to William Bayhylle, a Pawnee Indian, covering the following described land: "The west half of the northeast quarter of section twenty and the southwest quarter of the southeast quarter and the lot numbered six of section seventeen in Township twenty-three north of Range four east of the Indian Meridian, Oklahoma Territory containing one hundred and twenty-nine acres." Title to that tract is now held by the United States in trust for eight Indians to whom it passed by descent. These two Pawnee allotments are also bounded by the Arkansas River.

All four of the trust patents were issued under § 5 of the General Allotment Act of February 8, 1887,[17] and the trust period has been extended by Executive Orders as provided therein.

The portions of the river bed in suit were situated in Oklahoma Territory. The State of Oklahoma was admitted into the Union on November 16, 1907. All of the allotments were made prior to statehood.

On July 20, 1942, the State of Oklahoma executed two oil and gas leases in favor of Champlin Refining Company, covering the south half of the Arkansas River bed for a considerable distance, including the area of the river bed adjoining the four riparian tracts, and the Champlin Refining Company has drilled one well which is producing in commercial quantities.

On July 13, 1943, the United States commenced the instant action against the Champlin Refining Company to enjoin it from trespassing upon the river bed and drilling for oil and gas thereunder, and for a decree canceling the lease and quieting the title in the United States, its allottees, and their heirs. The State of Oklahoma intervened in the action.

On September 16, 1944, a stipulation was entered into to the effect that it should be considered that the United States had introduced evidence showing the Arkansas River to be nonnavigable in fact at the location of the river bed in controversy on all dates material in this case.

---

[12] 19 Stat. 28, 29.
[13] Other townships, not here involved, were included in the reservation.
[14] 22 Stat. 603, 624.

[15] Many other tracts, not here involved, were also included.
[16] I. Kappler, Indian Affairs, Laws and Treaties, 496–498.
[17] 24 Stat. 388, 389, 25 U.S.C.A. § 348.

The trial court found that the patents neither expressly included nor excluded the river bed and that the river, at all times material to the controversy, at the locations of the riparian tracts, was nonnavigable in fact.

In the case of State v. Nolegs, 40 Okl. 479, 139 P. 943, decided in 1914, the court took judicial notice of the fact that the Arkansas River was navigable, and held that the title of patentees to adjoining lands extended only to the high water mark of the stream. The land there involved was a homestead entry. The date of the patent is not disclosed.

The trial court held that the State had power to declare rivers navigable and to limit the title of riparian owners to the high water mark of the river, except where title to the river bed has been expressly granted by the United States prior to statehood, and that it was bound by the decision in State v. Nolegs, supra.

■■ In accordance with the constitutional principle of the equality of states, the title to the beds of rivers within a state passes to such state upon its admission into the Union, if the rivers are then navigable. If they are not then navigable, the title to the river beds, if a part of the public domain, remains in the United States. The question of navigability is determinative and is a Federal question.[18]

■ It is settled Federal law that streams or lakes which are navigable in fact are navigable in law and, conversely, if they are not navigable in fact, they are not navigable in law.[19]

■ Grants by the United States of its public lands bounded on streams or other waters, navigable or nonnavigable, made without reservation or restriction, are to be construed as to their effect according to the law of the state in which the land lies.

As regards such conveyances, the United States assumes the position of a private owner, subject to the general law of the state.[20] Where it is disposing of tribal lands of Indians under guardianship, the same rule applies.[21]

The question here presented is what title passed by the patents when they were issued in 1906 and 1907, prior to the admission of Oklahoma into the Union.[22]

Oklahoma could not adopt a retroactive rule for determining navigability which would destroy a title already accrued under Federal law and grant, or would enlarge what actually passed to Oklahoma at the time of her admission under the constitutional rule of equality.

In Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77, 86, 43 S.Ct. 60, 64, 67 L.Ed. 140, the court said:

"It is a natural inference that Congress in its grant to the Osage Indians in 1872 made it extend to the main channel of the river, only because it knew it was not navigable. This would be consistent with its general policy. Rev.Stats. § 2476 [43 U.S. C.A. § 931]; Oklahoma v. Texas, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771; Scott v. Lattig, 227 U.S. 229, 242, 33 S.Ct. 242, 57 L.Ed. 490, 44 L.R.A., N.S., 107; Railroad Company v. Schurmeir, 7 Wall. 272, 289, 19 L.Ed. 74. If the Arkansas river is not navigable, then the title of the Osages as granted certainly included the bed of the river as far as the main channel, because the words of the grant expressly carries the title to that line.

"But it is said that the navigability of the Arkansas river is a local question to be settled by the Legislature and the courts of Oklahoma, and that the Supreme Court of the state has held that at the very point here in dispute, the river is navigable. State v. Nolegs, 40 Okl. 479, 139 P. 943. A

---

[18] United States v. Utah, 283 U.S. 64, 75, 51 S.Ct. 438, 75 L.Ed. 844; United States v. Oregon, 295 U.S. 1, 14, 55 S.Ct. 610, 79 L.Ed. 1267.

[19] United States v. Holt Bank, 270 U.S. 49, 56, 46 S.Ct. 197, 70 L.Ed. 465; Oklahoma v. Texas, 258 U.S. 574, 586, 42 S.Ct. 406, 66 L.Ed. 771.

[20] Hardin v. Shedd, 190 U.S. 508, 519, 23 S.Ct. 685, 47 L.Ed. 1156; Hardin v. Jordan, 140 U.S. 371, 384, 11 S.Ct. 808, 35 L.Ed. 428; Whitaker v. McBride, 197 U.S. 510, 512, 25 S.Ct. 530, 49 L.Ed. 857.

[21] Oklahoma v. Texas, 258 U.S. 574, 595, 42 S.Ct. 406, 66 L.Ed. 771.

[22] Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77, 87, 43 S.Ct. 60, 67 L.Ed. 140.

similar argument was made for the same purpose in Oklahoma v. Texas, supra, based on a decision by the Supreme Court of Oklahoma as to the Red river. Hale v. Record, 44 Okl. 803, 146 P. 587. The controlling effect of the state court decision was there denied because the United States had not been there, as it was not here, a party to the case in the state court. Economy Light & Power Co. v. United States,. 256 U.S. 113, 123, 41 S.Ct. 409, 65 L.Ed. 847. In such a case as this the navigability of the stream is not a local question for the state tribunals to settle. The question here is what title, if any, the Osages took in the river bed in 1872 when this grant was made, and that was thirty-five years before Oklahoma was taken into the Union and before there were any local tribunals to decide any such questions. As to such a grant, the judgment of the state court does not bind us, for the validity and effect of an act done by the United States is necessarily a federal question. The title of the Indians grows out of a federal grant when the Federal Government had complete sovereignty over the territory in question. Oklahoma when she came into the Union took sovereignty over the public lands in the condition of ownership as they were then, and if the bed of a nonnavigable stream had then become the property of the Osages, there was nothing in the admission of Oklahoma into a constitutional equality of power with other states which required or permitted a divesting of the title. It is not for a state by courts or legislature, in dealing with the general subject of beds of streams to adopt a retroactive rule for determining navigability which would destroy a title already accrued under federal law and grant or would enlarge what actually passed to the state, at the time of her admission, under the constitutional rule of equality here invoked. * * *

"Some states have sought to retain title to the beds of streams by recognizing them as navigable when they are not actually so. It seems to be a convenient method of preserving their control. No one can object to it unless it is sought thereby to conclude one whose right to the bed of the river granted and vesting before statehood, depends for its validity on nonnavigability of the stream in fact. In such a case, navigability vel non is not a local question."

At the time the grants were made, the common law was in effect in Oklahoma Territory.[23]

 Under the rules of the common law, unless a contrary intention appears or is clearly inferable from the terms of the grant, the grantee of land, bounded by a nonnavigable stream or river, acquires title to the land to the center or thread of the water, on the theory that the grantor will not be presumed to have reserved a strip of land covered by water which will be of no practical value to him.[24]

In Oklahoma v. Texas, 258 U.S. 574, 595, 596, 42 S.Ct. 406, 66 L.Ed. 771, the patents to Indian allottees of the uplands adjoining the nonnavigable river contain no express inclusion or exclusion of the river bed. The Supreme Court held that, under the common law, the patents conveyed the title to the middle of the stream and rejected the contention that the common law rule had been impliedly abrogated in Oklahoma.

In United States v. Elliott, 10 Cir., 131 F.2d 720, 723, the court said:

"* * * At the time the United States made the grant to the Seneca and Shawnee Indians, the lands granted were not within a state or other local jurisdiction. The grant, therefore, was not subject to local law. It must be construed in accordance with the principles of the common law and the decisions of the United States Supreme Court. * * * Under the common law and the decisions of the United States Supreme Court, a grant of land bounded on a

---

23 St.1893, § 3874; St.1903, § 4200; Compiled Laws, 1909, § 5534; 12 Okl. St.Ann. § 2; Hoppe Hardware Co. v. Bain, 21 Okl. 177, 95 P. 765, 767, 17 L.R.A.,N.S., 310; McKennon v. Winn, 1 Okl. 327, 33 P. 582, 584, 585, 22 L. R.A. 501.

24 Oklahoma v. Texas, 258 U.S. 574, 595, 42 S.Ct. 406, 66 L.Ed. 771; United States v. Elliott, 10 Cir., 131 F.2d 720, 723, and cases there cited; Note, 74 A. L.R. 599.

nonnavigable river carries the exclusive right and title of the grantee to the center of the stream, unless the terms of the grant clearly denote the intention to stop at the edge or margin of the river."

■ We conclude that when the trust patents were issued, they conveyed the title to the center of the Arkansas River and that the State of Oklahoma could not, by legislative fiat or judicial decision, take from the Indian allottees what the United States had conveyed to them before statehood.[25]

Wear v. Kansas, 245 U.S. 154, 38 S.Ct. 55, 62 L.Ed. 214, is heavily relied upon by the State and the Champlin Refining Company. An examination of the opinion in that case in the Supreme Court of Kansas, where it was entitled "State v. Akers," [26] discloses that the court took judicial notice of the fact that the Arkansas River and the Kansas River were navigable in Kansas, and held that the test of navigability in law is navigability in fact. All that the Supreme Court of the United States held in the Wear case was that it was not error for the Supreme Court of Kansas, under the circumstances there presented, to determine, by the process of judicial notice, that the rivers were navigable in fact. Here, the trial court, from the stipulated facts, found that the river was nonnavigable in fact. The Supreme Court of Oklahoma could not, by a judgment to which neither the United States nor the heirs of the Indian allottees were parties, adjudge that the river was navigable and bind the United States and the heirs of Indian allottees by such adjudication.[27]

The judgment is reversed and the cause remanded with instructions to enter a judgment as prayed for in the complaint of the United States.

---

[25] See Coovert v. O'Conner, 8 Watts, (Pa.), 470; Allen v. Weber, 80 Wis. 531, 50 N.W. 514, 515, 14 L.R.A. 361, 27 Am.St.Rep. 51.

In the last-mentioned case the court said:

"The declaration made by the legislature of 1868, that Fox river is a navigable stream, could not possibly affect the rights of the owners of the dam, acquired long before, or make the dam navigable, or any other part of Fox river, in any other sense than mere theory. The defendants' rights are fixed by their deeds, and that act certainly could not change them in the least."

[26] 92 Kan. 169, 140 P. 637, Ann.Cas. 1916B, 543.

[27] See Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77, 87, 43 S.Ct. 60, 67 L.Ed. 140; Oklahoma v. Texas, 258 U.S. 574, 591, 42 S.Ct. 406, 66 L. Ed. 771.