235 F.2d 30
 The CHOCTAW AND CHICKASAW NATIONS, Appellants,
v.
Wilmer D. SEAY; J. B. Stoddard; Philip H. Broun; Bridwell Oil Company, a co-partnership composed of J. S. Bridwell, Margaret Browdle and Frank Browdle; Long, Yingling and Lauck, a co-partnership composed of M. J. Long, E. V. Yingling and D. R. Lauck; and Continental Oil Company, a corporation, Appellees.
 No. 5284.
 United States Court of Appeals Tenth Circuit.
 June 8, 1956.
 
 COPYRIGHT MATERIAL OMITTED W. F. Semple, Tulsa, Okl. (Lynn Adams, Oklahoma City, Okl., and Lee Welch, Antlers, Okl., on the brief), for appellants.
 Richard R. Linn, Oklahoma City, Okl. (Richard D. Stone, Waurika, Okl., S. J. Montgomery, Oklahoma City, Okl., John E. Kilgore, Dallas, Tex., for Kilgore & Kilgore, W. M. Cleaves for Cleaves & Cleaves, Houston, Tex., Dwight L. Simmons, Dallas, Tex., for Thompson, Knight, Wright & Simmons, R. O. Wilson, Harry Dippel, Fort Worth, Tex., on the brief), for appellees.
 Before BRATTON, Chief Judge, PHILLIPS, Circuit Judge, and ROGERS, District Judge.
 PHILLIPS, Circuit Judge.
 
 
 1
 The Choctaw and Chickasaw Nations brought this action to quiet the title to certain lands extending from the medial or center line of Red River and the southern or right-hand bank of such river and lying opposite Lot 1 of Section 10 and Lots 3, 4 and 5 of Section 3, all in Township 7 South, Range 5 West, Jefferson County, Oklahoma.
 
 
 2
 The Choctaw and Chickasaw Nations claim title to all of the lands between the medial line and the south or right bank of Red River, extending from the 98th meridian east to the boundary line between Arkansas and Oklahoma.
 
 
 3
 Seay, a defendant below, claims title in fee to the lands above described and to a royalty interest under oil and gas leases given by him as lessor of such lands. The other defendants below claim through Seay as lessees or as owners of overriding royalty interests.
 
 
 4
 On October 18, 1820, a treaty, 7 Stat. 210, was entered into between the United States and the Choctaw Nation, by which the Nation ceded to the United States certain lands in the State of Mississippi in exchange for "a tract of country west of the Mississippi River, situate between the Arkansas and Red River". The treaty specifically described the tract of land ceded to the Choctaw Nation as follows:
 
 
 5
 "* * * Beginning on the Arkansas River, where the lower boundary line of the Cherokees strikes the same; thence up the Arkansas to the Canadian Fork, and up the same to its source; thence due South to the Red River; thence down Red River, three miles below the mouth of Little River, which empties itself into Red River on the north side; thence a direct line to the beginning."
 
 
 6
 Thereafter, it was discovered that a part of the tract last above described, lying east of what is now the boundary line between the States of Oklahoma and Arkansas, was occupied by white settlers. Thereupon, by the treaty of January 20, 1825, 7 Stat. 234, the Choctaw Nation receded to the United States that part of such tract which lies east of such boundary line.
 
 
 7
 The Act of Congress of May 28, 1830, 4 Stat. 411, authorized the President of the United States to offer lands west of the Mississippi River in exchange for other lands belonging to Indians who chose to make the exchange. Under the authority of this Act the treaty of September 27, 1830, 7 Stat. 333, was entered into, ceding to the Choctaw Nation the same lands as had been ceded by the treaty of October 18, 1820, excepting, however, the part of said tract lying east of the eastern boundary line of the State of Oklahoma. Such land was described in the treaty as follows:
 
 
 8
 "* * * beginning near Fort Smith where the Arkansas boundary crosses the Arkansas River, running thence to the source of the Canadian fork; if in the limits of the United States, or to those limits; thence due south to Red River, and down Red River to the west boundary of the Territory of Arkansas; thence north along that line to the beginning."
 
 
 9
 To settle misunderstandings which had arisen between the Choctaw and the Chickasaw Nations, a treaty was entered into between the two nations on January 17, 1837, 11 Stat. 573, by which a district for the Chickasaw Nation was created and described as follows:
 
 
 10
 "* * * beginning on the north bank of Red River, at the mouth of Island bayou, about eight or ten miles below the mouth of False Wachitta, thence running north along the main channel of said bayou to its source; thence along the dividing ridge between the Wachitta and Low Blue rivers, to the road leading from Fort Gibson to Fort Wachitta; thence along said road, to the line dividing Mushallatubbee and Pushmatahaw districts; thence, eastwardly, along said district line, to the source of Brushy Creek; thence, down said creek, to where it flows into the Canadian River, ten or twelve miles above the mouth of the south fork of the Canadian; thence, west, along the main Canadian River, to its source, if in the limits of the United States, or to those limits; and thence, due south to Red River, and down Red River to the beginning."
 
 
 11
 Pursuant to the Act of May 28, 1830, supra, a patent was issued on March 23, 1842, conveying to the Choctaw Nation the tract described in the treaty of 1830.
 
 
 12
 Disagreements continued to exist between the Government of the United States and the Choctaw Indian Nation, and on June 22, 1855, 11 Stat. 611, a new treaty, by its terms superseding all former treaties between the United States and the Choctaws and also superseding all treaty stipulations between the United States and the Chickasaws and between the Choctaws and the Chickasaws inconsistent with it, was made, in which the territorial limits of the Choctaw and Chickasaw Indian Nations were described as follows:
 
 
 13
 "* * * Beginning at a point on the Arkansas River, one hundred paces east of old Fort Smith, where the western boundary line of the State of Arkansas crosses the said river, and running thence due south to Red River; thence up Red River to the point where the meridian of one hundred degrees west longitude crosses the same; thence north along said meridian to the main Canadian River; thence down said river to its junction with the Arkansas River; thence down said river to the place of beginning."
 
 
 14
 Out of this a district for the Chickasaws was established, described as follows:
 
 
 15
 "* * * beginning on the north bank of Red River, at the mouth of Island Bayou, where it empties into Red River, about twenty-six miles on a straight line, below the mouth of False Wachitta; thence running a northwesterly course along the main channel of said bayou, to the junction of the three prongs of said bayou, nearest the dividing ridge between Wachitta and Low Blue Rivers, as laid down on Capt. R. L. Hunter's map; thence northerly along the eastern prong of Island Bayou to its source; thence due north to the Canadian River; thence west along the main Canadian to the ninety-eighth degree of west longitude; thence south to Red River; and thence down Red River to the beginning."
 
 
 16
 Thus, it will be observed that by a series of treaties beginning in 1820, the land ceded to the Choctaw was uniformly described as extending "to Red River" and bounded on the south by a line running "down Red River" or "up Red River".
 
 
 17
 In 1898, Congress enacted the so-called Curtis Act, 30 Stat. 495. That act provided for the allotment of the lands of the Five Civilized Tribes without the consent of the tribes. Thereafter, the Five Civilized Tribes entered into treaties with the United States for the allotment of their lands. The Atoka Agreement, a treaty entered into by the Choctaws and Chickasaws with the United States, and which became a part of the Curtis Act, provided for the allotment of the land of the Choctaws and Chickasaws. However, a more comprehensive scheme for the allotment of such lands and the sale of the residue, or unallotted lands, was provided for in the Act of July 1, 1902, 32 Stat. 641, which was thereafter ratified by the Choctaws and Chickasaws as a supplemental treaty. Sections 12 and 13 of the last-mentioned act deal with allotment of lands to members of the two tribes. Section 14 provides for the sale by the United States of the lands remaining after all allotments had been made. After the allotments were completed, unallotted land sales were had in different parts of the Choctaw and Chickasaw Nations.
 
 
 18
 In 1898, the tribal lands of the Choctaw and Chickasaw Nations were surveyed, preparatory to the allotment of the land in severalty to the tribal members. The survey comported with the standards followed in the survey of Federal public lands. It included such Lots 1, 3, 4 and 5. In running the survey along the Red River, the Government surveyors meandered the north bank of the river and did not extend the survey lines in the river beyond the meander line thus established. Such Lots 1, 3, 4 and 5 extend northward from such meander line. The acreage of such lots, as shown by the survey, was computed by determining the area lying above the meander line and the other boundaries of such lots.
 
 
 19
 The four lots referred to above were advertised for sale at Ryan, Oklahoma, on November 15, 1912. The notice of sale described them as fractional lots, set forth the total acreage in each lot, in accordance with the survey, and fixed a minimum price.
 
 
 20
 At such sale Seay purchased such lots. He completed the payment of the purchase price therefor in 1917 and on September 25, 1917, an unallotted deed was issued to him in which such lots were described as follows:
 
 
 21
 "* * * Lots One (1), * * * Three (3) Four (4) and Five (5) * * * of Section Three (3) * * * and Lots One (1) * * * of Section Ten (10) * * * Township Seven (7) South and Range Five (5) West, of the Indian Base and Meridian, in Oklahoma, containing Four Hundred Ninety five and 40/100 (495.40) acres, more or less, as the case may be, according to the United States survey thereof."
 
 
 22
 The acreage, as recited in the deed, was the acreage as shown by such survey of such lots and other lands included in the deed.
 
 
 23
 Grants by the United States of its public lands bounded on non-navigable streams, made without reservation or restriction, showing an intent to restrict the conveyance to the upland, are to be construed as to their effect according to the law of the state in which the lands lie. As regards such conveyances, the United States assumes the position of a private owner, subject to the general law of the state.[1] The same rule applies where the United States disposes of tribal lands of Indians under guardianship.[2]
 
 
 24
 The common law, as modified by the constitutional and statutory law, judicial decisions and the conditions and wants of the people, remains in force in Oklahoma.[3]
 
 
 25
 Under the common law, a grant of land bounded on a non-navigable river by a grantor who owns to the center or thread of the stream conveys to the grantee the land to the center or thread of the stream, unless the terms of the grant and the attendant circumstances clearly denote an intention to stop at the edge or margin of the river.[4]
 
 
 26
 When, however, the grantor owns the entire bed of the stream, but no part of the upland on the opposite side, in the absence of a clear indication of a contrary intention from the terms of the grant and the attendant circumstances, the grant will be construed to convey to the grantee the entire bed of the stream.[5]
 
 
 27
 The rule is bottomed on two reasons: (1) A grantor will be presumed not to have reserved a strip of land covered by water, which would be of little practical value to him; (2) It is a wise public policy, to prevent vexatious litigation likely to arise from retention of title to the river bed in the grantor, on the happening of some unexpected event.[6]
 
 
 28
 The Supreme Court of Oklahoma has adopted and applied the common law rule.[7]
 
 
 29
 We, therefore, conclude that the grant to the Choctaws and Chickasaws conveyed title to them to the south bank of the stream. This conclusion is supported by a well considered opinion of the Attorney General to the Secretary of the Interior, under date of July 12, 1927. See 35 Opinions of the Attorney General, p. 251.
 
 
 30
 It has been the policy of the Federal government, from its origin, in disposing of the public land bordering on non-navigable streams to measure the price to be paid for it by the quantity of upland granted and to make no charge for land under the bed of a stream. To carry out that policy, meander lines are run in surveying fractional portions of land bordering upon non-navigable rivers, not as boundaries of the tracts, but for the purpose of defining the sinuosities of the banks of the stream and to ascertain the quantity of land in the fractions for which a purchaser is to be charged.[8]
 
 
 31
 The practice of the Federal government in surveying public lands bordering on non-navigable streams was adopted and followed in surveying the four lots described above.
 
 
 32
 Section 14 of the Act of July 1, 1902, clearly indicated a purpose and intent on the part of Congress to dispose of all of the residue of lands remaining after the allotments provided for in such Act had been made to all citizens or freedmen of the Choctaw and Chickasaw Nations.
 
 
 33
 This was in keeping with a policy clearly manifest by the Congress, which looked to the allotment of tribal lands to individuals and the gradual termination of the tribes as entities.[9]
 
 
 34
 We conclude that there was nothing in the language of the deed to Seay or the attendant circumstances to indicate an intention to reserve any portion of the river bed in the tribes. The only fact that can be pointed to in support of such an intention is the reference to the survey in the deed and the fact that the survey embraced a meander line. When the purpose for running a meander line and the function of such a line is understood, we think no intention to retain the river bed can be inferred from the reference to the survey, which embraced a meander line.
 
 
 35
 The conclusions we have reached are supported by a number of administrative interpretations, evidenced by opinions and letters of the Department of Interior.[10]
 
 
 36
 Counsel for the tribes rely strongly on the Act of May 26, 1930, 46 Stat. 385, which authorized the Secretary of the Interior "to lease for oil and gas purposes any or all of the remaining tribal lands of the Chickasaw and Choctaw Nations, including the lands lying south of the medial line of Red River to the south bank thereof, east of the ninety-eighth meridian, and down Red River to three miles below the mouth of Little River which empties itself into Red River on the north side".
 
 
 37
 The record discloses that in 1929 the Chickasaws and Choctaws had approximately 104,000 acres of unallotted lands. It may well be that some of these lands adjoined the north bank of the river. In that case the tribes would own lands extending to the south bank.
 
 
 38
 Counsel for the tribes also rely upon the fact that the Secretary of the Interior approved two oil and gas leases executed by them on portions of the south half of the river in July and September, 1953, but the record is silent as to the ownership of the adjacent lands on the north bank of the river. It may well be that such adjacent lands were remaining tribal lands, never having been allotted or sold.
 
 
 39
 At the oral argument, counsel for the tribes admitted the significant fact that no leases had been made or approved under the 1930 Act upon lands lying south of the medial line of the river, where opposite lands adjoining the north bank of the river had been sold and conveyed under unallotted land sales.
 
 
 40
 We conclude, therefore, that Seay acquired title to that portion of the river bed here in controversy.
 
 
 41
 The judgment is affirmed.
 
 
 
 Notes:
 
 
 [1]
 United States v. Champlin Refining Co., 10 Cir., 156 F.2d 769, 773, affirmed 331 U.S. 788, 67 S.Ct. 1346, 91 L.Ed. 1818; Hardin v. Shedd, 190 U.S. 508, 519, 23 S.Ct. 685, 47 L.Ed. 1156; Hardin v. Jordan, 140 U.S. 371, 384, 11 S.Ct. 808, 35 L.Ed. 428; Whitaker v. McBride, 197 U.S. 510, 512, 25 S.Ct. 530, 49 L.Ed. 857
 
 
 [2]
 State of Oklahoma v. State of Texas, 258 U.S. 574, 595, 42 S.Ct. 406, 66 L.Ed. 771; United States v. Champlin Refining Co., 10 Cir., 156 F.2d 769, 773, affirmed 331 U.S. 788, 67 S.Ct. 1346, 91 L.Ed. 1818
 
 
 [3]
 12 O.S.A. § 2; Oklahoma City v. District Court of 13th Judicial District, 168 Okl. 235, 32 P.2d 318, 320, 93 A.L.R. 489
 
 
 [4]
 United States v. Elliott, 10 Cir., 131 F. 2d 720, 723; United States v. Champlin Refining Co., 10 Cir., 156 F.2d 769, 774, affirmed 331 U.S. 788, 67 S.Ct. 1346, 91 L.Ed. 1818; State of Oklahoma v. State of Texas, 258 U.S. 574, 595, 42 S.Ct. 406, 66 L.Ed. 771; Note, 74 A.L.R. 597
 
 
 [5]
 Leary v. Mayor and Alderman of Jersey City, C.C., 189 F. 419, affirmed 248 U.S. 328, 39 S.Ct. 115, 63 L.Ed. 271; Young v. Harrison, 6 Ga. 130, 141; Jones v. Water Lot Co., 18 Ga. 539, 541
 
 
 [6]
 United States v. Champlin Refining Co., 10 Cir., 156 F.2d 769, 774, affirmed 331 U.S. 788, 67 S.Ct. 1346, 91 L.Ed. 1818. Paine v. Consumers' F. & S. Co., 6 Cir., 71 F. 626, 629
 
 
 [7]
 State ex rel. Commissioners of Land Office v. Warden, 200 Okl. 613, 198 P.2d 402; Braddock v. Wilkins, 182 Okl. 5, 75 P.2d 1139; Phillips Petroleum Co. v. Davis, 194 Okl. 84, 147 P.2d 135; Cuneo v. Champlin Refining Co., 178 Okl. 198, 62 P.2d 82, 87
 
 
 [8]
 United States v. Elliott, 10 Cir., 131 F.2d 720, 724; Hardin v. Jordan, 140 U.S. 371, 380, 381, 11 S.Ct. 808, 35 L. Ed. 428; St. Paul & P. Railroad Co. v. Schurmeier, 7 Wall. 272, 286, 287, 19 L.Ed. 74; Braddock v. Wilkins, 182 Okl. 5, 75 P.2d 1139, 1140, 1141; State ex rel. Commissioners of Land Office v. Warden, 200 Okl. 613, 198 P.2d 402, 404, 405; See also: Allott v. Wilmington L. & P. Co., 288 Ill. 541, 123 N.E. 731, 734; Sizor v. City of Logansport, 151 Ind. 626, 50 N.E. 377, 44 L.R.A. 814; Tucker v. Kruse, 126 Minn. 214, 148 N.W. 60
 
 
 [9]
 See United States v. Hayes, 8 Cir., 20 F.2d 873, 878-887, certiorari denied United States v. Cimarron River Oil Co., 275 U.S. 555, 48 S.Ct. 116, 72 L.Ed. 423
 
 
 [10]
 Opinion of Attorney General of July 12, 1927, 35 Opinions of the Attorney General 251; Solicitor's Opinion, Department of Interior, to the Secretary of the Interior, under date of March 25, 1926, in which it was expressly held that the entire river bed passed to allottees who were allotted lands extending northward from the north bank of the river and to the grantees of lands purchased at unallotted land sales, where such lands extended northward from the north bank of the river; Opinion of Commissioner Ipry of the General Land Office to Department of Interior, April 2, 1928, involving the particular lands here in controversy; A letter dated October 22, 1929, from the Supervisor of the Geological Survey and a letter dated November 29, 1929, from the Superintendent of the Five Civilized Tribes, holding that the allottees and grantees of the land along the north bank of the Red River in Oklahoma own the river bed to the south bank of the river