WAYNE J. HECKMAN *et al.*, Plaintiffs and Counterdefendants-Appellants, *v.* CARL R. KRATZER *et al.*, Defendants and Counterplaintiffs-Appellees.—(THE NORTHERN ILLINOIS CONFERENCE OF THE UNITED METHODIST CHURCH *et al.*, Defendants-Appellees.)

Second District (1st Division)   No. 75-82

Opinion filed November 19, 1976.

Fearer & Nye, of Oregon, for appellants.

Keller & Magdich, of Dixon, and Samuel W. Witwer, Jr., of Witwer, Moran, Burlage & Atkinson, of Chicago, for appellees.

Mr. JUSTICE HALLETT delivered the opinion of the court:

The issue in the case is whether a lot described in a surveyor's certificate as "lying north of the Rock River" includes the land to the center of the Rock River including an island lying just offshore from the lot although in previous conveyances the water and the island had always been specifically conveyed separately from the land and although the plat showed the lot corners marked by monuments and did not indicate that the island was part of the subdivision platted.

The land in question is part of Hensons Riverview Subdivision located in Lee County, Illinois, and land lying south of it. On December 9, 1958, Mr. and Mrs. Cochran conveyed by warranty deed the following described property to Mr. and Mrs. Henson:

"All that part of the said East Half of Section 1 lying south of the center of the Public Highway which runs diagonally across said Section 1, and north of Rock River, except the following described tract of land: Commencing at a point on the east line of said Section 1, 1639.0 feet south of the northeast corner thereof measured on said east line and extending thence southwest on the center line of a public road at an angle of 60 degrees 28 minutes measured clockwise from said east line of Section 1 a distance of 1214.25 feet; thence southeasterly at an angle of 107 degrees 17 minutes measured clockwise from the last described course a distance of 549.6 feet; thence southeasterly at an angle of 183 degrees 22 minutes measured counterclockwise from the last

described course a distance of 199.5 feet to the bank of Rock River; thence northeasterly along the bank of Rock River to the east line of said Section 1; thence north on said east line to the point of beginning."

On the same day the Cochrans quitclaimed to the Hensons part of the southwest quarter of section 6 and also "that part of the Southeast Quarter of Section 1, Township 21 North, Range 8, East of the Fourth Principal Meridian lying North of the center of Rock River and South of the Northerly bank of the River; also, the island in Rock River lying within and South of the premises herein described." The Cochrans had received this and neighboring land from Reynolds Wire Co., who had received it from the Ralstons in 1938. In both of the deeds the rights to the territory in the River and to the island (described as south of the easterly end of the premises herein described which included all of the east half of Section One lying south of the center of the highway as well as land east of that) were separately conveyed. When the land was subdivided in 1959 the surveyor's certificate simply adopted the description appearing in the warranty deed to the Hensons. The plat on the following page shows the subdivision. The corners were marked by iron pins.

According to the 1968 survey, the island in question starts, on the west, south of the eastern third of lot 7 of the subdivision and runs east past lots 8, 2 and 1, the large area east of the subdivision belonging to the Methodist Church, and ends in section 6. In all places it lies north of the center of the Rock River.

The defendants Mr. and Mrs. Pettenger and Mr. and Mrs. Kratzer purchased lots 8 and 7 respectively from Mr. and Mrs. Chadwick and Mr. and Mrs. Busser in 1964 and 1965 respectively. The deeds simply conveyed the lots according to the plat so that the description in the plat is controlling. The plaintiff Mr. and Mrs. Heckman purchased lot 2 from Mr. and Mrs. Ernst, Sr., in 1969. In 1973, they also received from Mr. and Mrs. Henson a warranty deed to lot 1 and a quitclaim deed to all of the territory which had been conveyed to the Hensons by quitclaim deed. Presumably the Bussers and the Chadwicks received their lots from the Hensons but their deeds are not in the record.

The plaintiffs filed this action to quiet title to the property conveyed by the quitclaim deed. The defendants Kratzer and Pettenger counterclaimed claiming ownership to the middle of the River and claimed ownership of that portion of the island (if it was an island) facing their lots. They also denied that in fact it was an island and claimed ownership by accretion and alluvion.

Regarding the last contention there was testimony by the Kratzers that most of the year one could walk from their lot to the so-called island. However, at times when the water level went very low they would

**PLAT OF**

**HENSONS RIVERVIEW SUBDIVISION**

LOCATED IN

SEC. 1, T. 21 N., R. 8 E. OF 4TH P.M.

LEE COUNTY, ILLINOIS

1959

SCALE: 1" = 100'

receive notice that people had been working on Sterling Dam. Mr. Kratzer also testified that no part of the so-called island connected with the Methodist Campground lying east of lot 1; the connection was limited to lots 7, 8, 1 and 2. According to Mr. Kratzer the reason there is now water around the island 12 months of the year is because the plaintiff blasted a trench through the floodplain.

Mr. Heckman, on the other hand, testified that he had taken possession of the island in October 1964, and that there was always water between the island and the subdivision. He did not, by making a ditch, put water between the island and the subdivision. Indeed, according to his testimony there has been no change in the amount of water at the end of lots 7 and 8 because of the blasting.

Mr. Henson, the subdivider, testified that he had been familiar with the property and the island since 1923 and that he had bought it as an island and sold it as an island. Since the time he purchased the land until about 1966 he was on it nearly every day and there was always water between the mainland and the island.

The other defendant, the Methodist Church, concedes that it received by its deed no right to the riverbed and the island and merely sought protection of its common law riparian rights which was granted. (It was stipulated that the Rock River was a navigable river.) The plaintiffs have not appealed from that part of the decision.

The court held that the title of the two defendants was not limited to the northerly bank of the Rock River but extended to the center of the Rock River.

■■ The counter-plaintiffs contend, and the court so found, that because of their ownership of the land, they also own to the center of the river. The generally accepted rule in Illinois and elsewhere is that unless an intention to the contrary is manifest, a grant of land bounded on a stream will convey the land under water to the middle thread of the stream if the grantor's title extends so far (*Braxon v. Bressler* (1872), 64 Ill. 488; *Allot v. Wilmington Light & Power Co.* (1919), 288 Ill. 541, 123 N.E. 731; 36 Ill. L. & Pr. *Waters*, §§32, 46 (1958); see also 93 C.J.S. *Waters* §84 (1956), and similarly the grantee's title generally extends to any islands lying between his estate and the middle of the channel of the stream (36 Ill. L. & Pr. *Waters* §30 (1958)). However, the rule is merely a presumption, and the rule is not enforced where it appears that by the terms of the grant and all of the attendant circumstances the intention of the grantor was to confine the grantee to the bank of the river (*Huff v. Hastings Express Co.* (1902), 195 Ill. 257, 63 N.E. 105 (highway)), and one man may own the bed of a stream and another its banks (*Rockwell v. Baldwin* (1869), 53 Ill. 19; *People v. Board of Supervisors* (1888), 125 Ill. 9, 17 N.E. 147). As stated in 93 C. J. S. *Waters* §84, at 758 (1956):

"The rule under consideration is nothing more than a rule of construction, to be used in ascertaining the true meaning of the parties. While an intent to exclude the bed of the stream will not be presumed, but must be clear from the terms of the deed as interpreted by the surrounding circumstances, the question whether the conveyance carries title to the center of the stream depends on the intent of the parties, to be gathered from the description of the premises read in connection with other parts of the deed and by reference to the situation of the lands and the condition and relation of the parties to those and other lands in the vicinity, and, in some instances, by reference to the acts or conduct of the parties subsequent to the grant.

The presumption that the conveyance carries to the middle thread of the stream is not conclusive; and, if anything appears which indicates an intention on the part of the grantor to limit his conveyance to the upland, only such intention will prevail. The presumption that the bed of the stream was conveyed may be overcome by other expressions of the deed; by external facts, such as other natural boundaries and even artificial marks in the survey accompanying the conveyance showing a different intention; or by certain and immemorial usage contrary to the presumption."

Moreover, since the presumption is based on the theory that the grantor will not be presumed to have reserved a strip of land covered with water which will be of no practical value to him (*United States v. Champlin Refining Co.* (10th Cir. 1946), 156 F.2d 769, *aff'd*, 331 U.S. 788, 91 L. Ed. 1818, 67 S. Ct. 1346; 93 C.J.S. *Waters* §84, at 757-58 (1956)), the force of the presumption would seem to be weakened where as here the grantor did retain land near the water including, concededly, the major part of the island, and the control of the water around the island could be of vital importance to him.

The counter-plaintiffs actually failed to establish any of their title rights since they failed to show what title had been conveyed to their grantors. Obviously, their grantors could convey only those rights to the riverbed and island that they had. (12 Am. Jur. 2d *Boundaries* §21 (1964).) However, since the issue was never raised by the appellants either in the trial court or on appeal, it is obviously waived. For purpose of argument, this court will assume that the deeds to the grantors were identical in scope to those conveying the land to the counter-plaintiffs and contained no exceptions.

While the mere use of the phrase "lying north of the river" has been held not to bar the grantee from taking to the middle of the river (*Gill v. Hedgecock* (1944), 207 Ark. 1079, 184 S.W.2d 262), here that phrase must be construed in the light of the description of the northern boundary

which was "all that part * * * lying south of the *center* of the public highway." Since the same presumption applies to highways as to rivers (5 Ill. L. & Pr. *Boundaries* §15 (1953)), it must be assumed that the radical difference in the description was intentional, and the fact it is so different indicates that the two descriptions were not intended to convey the same meaning (*People v. Board of Supervisors* (1888), 125 Ill. 9, 17 N.E. 147). Since the description in the surveyor's certificate is simply that given in the warranty deed from the Cochrans to the Hensons it may be assumed that the same meaning was intended. Yet it is clear that that warranty deed was intended to convey title neither to the riverbed nor to the island since a quitclaim deed to both was given on the same day. In addition, since the Hensons did retain ownership of all of the island which lay to the southeast of the subdivision, as was admitted by the Methodist Church, it is more likely that they did not intend to give up ownership and control of the west tip of the island and the surrounding waters, an island which is not even shown on the plat which supposedly shows all of the area of the subdivision.

The cases relied on by the defendants (*Allott v. Wilmington Light & Power Co.* (1919), 288 Ill. 541, 123 N.E. 731; *Piper v. Connelly* (1884), 108 Ill. 646; *Sikes v. Moline Consumers Co.* (1920), 293 Ill. 112, 127 N.E. 342) are actually more favorable to the plaintiffs' position.

In *Allott*, as the court pointed out, the certificate referred to the lots as water lots; the certificate did not do so in this case. More importantly, the court stated that there was nothing in the record to indicate any intention to limit the length of the lots except as they were limited by the course of the river and if the original owners had intended to limit the western (river) boundaries to the distances fixed on the plat they would have located fixed monuments there. But this is exactly what the developer did do in the present case. The southern boundary of each lot is shown by the placement of an iron pin with the distance from the pin to the true corner being marked on the plat. In *Piper*, a single line on the map showed the boundary of the land as being the river. The court pointed out:

> "Had it been intended the grantor was reserving to himself the ownership of the entire stream, the plat, to have been accurate, would have had another line, parallel to that indicating the stream, indicating the line of its bank, and, consequently, the boundary line. We are not to assume this plat is not accurate, but must assume that it more fully represents the intention of the parties than the preceding language, so far as fixed monuments are concerned, and that it was made and adopted by the parties because they were not fully satisfied with the language they had employed in that respect." (108 Ill. 646, 654.)

In the present case, the boundary of the subdivision (and of the southern

lots) was shown by a heavy black line and then the river was shown by three lighter lines. Following the doctrine laid down in *Piper*, therefore, we must assume the grantor intended to reserve to himself ownership of the entire stream. In addition, in *Piper*, the contract of sale granted water privileges to the grantee; as the court pointed out this rendered it absolutely certain that the defendants' rights were not intended to terminate at the water's edge. No such rights were granted in the instant case. *Sikes* reiterated the doctrine laid down in *Piper* that if there are two lines, one line showing distinctly the boundary of the plat and another distinct line showing the boundary of the stream, the platter is presumed to reserve to himself the ownership of the land in the stream. In the present case, unlike *Sikes*, the boundary of the plat is parallel to the river line but the lines are still separate and distinct.

The appellees, however, contend that in fact the so-called island was not an island before the blasting and that accordingly they owned it or a part of it. The court did not specifically determine this issue, but the evidence is overwhelming that at least up to the time of the conveyance of lots 7 and 8 by the Hensons the island was in fact an island. In fact the defendants introduced no evidence at all as to the condition of the island at the time of the conveyance by the Hensons. Mr. Henson, a disinterested witness, testified that he had been familiar with the land for decades, that he had purchased the island as an island and had sold it as an island and that whenever he had been on the property he owned there was water between the island and the subdivision. The conveyance from the Ralstons refers to the island as an island. So does the conveyance from Reynolds Wire Co., the one from the Cochrans and the one from the Hensons. The plat of the subdivision shows the river coming up to the defendants' property which is marked as terminating around 70 feet after the iron pins. But the river could not have come to this point unless the river ran between that point and the island. Furthermore, on the plat the lots are shown as curving northward, not southward as would be true if the island had been connected to the mainland. In addition, the Kratzers themselves testified that as to the years 1964-1967, only a narrow end of the "island" was sometimes connected to the shore area and that the low water was connected with work on the dam. Obviously, the temporary joining in 1964, 1965 and 1966 of an island owned by the Hensons to a mainland lot owned by the defendants could not deprive the Hensons of their ownership of the island. The doctrine of accretion does not go so far.

■■ Furthermore, if the island was not an island at the time of the platting of the subdivision and the conveyance of lots 7 and 8 by the Hensons, it is clear that the defendants would have no right to the so-called island or the land connecting it to the lot since the doctrines of

riparian rights and accretion would not be applicable. The deeds conveying the land to the defendants did not describe the land but only referred to the plat for identification of the lots. Accordingly the description of the lots in the plat is controlling. (*Piper v. Connelly* (1884), 108 Ill. 646.) The surveyor's certificate describes the subdivision as lying north of the river, but the individual lots are not so described. Rather the surveyor chose to mark the corners of the lots by fixed monuments—iron pins—in certain instances giving fixed distances between the monument and the actual corner (presumably because the varying water elevation might make it difficult to find the pins if they were fixed at the actual corners). Thus, the southwest corner of lot 7 is 70 feet from the iron pins and the southeast is 77 feet; the southwest corner of lot 8 is 77 feet from the pin and the southeast boundary is 50 feet from the iron pin. While the river is shown as the southern boundary, it is clear from the express language of the certificate that the lot corners were meant to be determined by the iron pins and if in fact there was no river bordering on lots 7 and 8 then the defendants are entitled only to the property designated on the plat as lots 7 and 8 and not being riparian owners would not have any riparian rights.

■■ The counter-plaintiffs also contend that the so-called island in contention is not the one referred to in the other conveyances as lying in the north part of the Rock River, south of the eastern part of the lands conveyed although this is precisely the position of this piece of land. But even if this land did not exist before the conveyance by the Hensons, and all of the evidence is to the contrary, the defendants still would not be entitled to it under the doctrine of accretion. To acquire title by accretion it is necessary that the process be gradual and imperceptible. (93 C.J.S. *Waters* §108 (1956).) If, as the defendants seem to contend, the land developed since the lots were conveyed, this development could hardly be considered to be gradual and imperceptible.

■■ For the foregoing reasons, we reverse the decision of the trial court in favor of the counter-plaintiffs and remand with instructions that title to the land set forth in the complaint be quieted in the plaintiffs. We affirm that part of the decision establishing the riparian rights of the Methodist Church.

Affirmed in part, reversed in part and remanded with instructions.

GUILD, P. J., and SEIDENFELD, J., concur.